**UNITED STATES of America,**

v.

**Jack GISEHALTZ, Joseph Missone, David Schwartz and Sam Yoselowitz, Defendants.**

**No. 66 Cr. 218.**

United States District Court
S. D. New York.

Aug. 17, 1967.

Robert M. Morgenthau, New York City, by, Frank M. Tuerkheimer, Asst. U. S. Atty., for the Government.

Moses L. Kove, New York City, for Gisehaltz.

Thomas Edwards, New York City, for Missone.

Abraham H. Brodsky, New York City, for Schwartz.

CANNELLA, District Judge.

### MEMORANDUM

This case was tried non-jury, upon the application of the defendants and the consent of the U. S. Attorney.

The indictment comprised 13 counts and charges a conspiracy together with 12 substantive counts in violation of the Internal Revenue Law.[1]

There was no serious question during the trial as to the appropriate law either as to the conspiracy or as to the substantive counts. The question was in essence the credibility of the witnesses. The defendants Gisehaltz and Schwartz took the stand, Missone did not. The court drew no inference of guilt from the defendant Missone's failure to testify. The defendant Gisehaltz in addition to his own testimony produced the character testimony and alibi testimony.

## DEFINITION OF THE CONSPIRACY IN THE INDICTMENT

 A criminal conspiracy is one in the nature of a criminal partnership. The conspiracy alleged must be established beyond a reasonable doubt, by credible evidence of the acts, declarations and conduct of the person charged. The individual defendant's connection with the conspiracy must be proven by his own acts, declarations and conduct. Once the conspiracy is established, then all members of the conspiracy are bound by the action of all the other members of the conspiracy, provided that they are done in furtherance of the purpose of the conspiracy, during the life of the conspiracy. The importance of the role of the conspirator does not control the question of whether or not the individual is or is not a member of the conspiracy. Some defendants in a conspiracy are more important than others. Of course, there must be at least two conspirators, since one cannot conspire with oneself. In addition, since our jurisprudence does not punish for mere thought, there must be the commission of at least one pleaded overt act, by one of the conspirators during the life of the conspiracy in furtherance of the aims and purposes of the conspiracy. The overt act may be legal or illegal in nature. Statements made by any conspirator after the conspiracy has ended, cannot establish the conspiracy, they are merely narrative in nature and serve no purpose other than to implicate the speaker. If the statement is in the nature of an admission or confession, it may be used as against him.

 The essence of this conspiracy was the unlawful agreement or combination to deprive the U. S. Government of essential tax information to which it was entitled under congressional action. Its successful accomplishment was immaterial to the question of guilt or innocence.

 Once the conspiracy is established beyond a reasonable doubt from all the credible evidence, it must be determined whether the defendant unlawfully, knowingly and wilfully entered into it. Each defendant is entitled to an individual judgment as to him on this point. His individual knowledge of the unlawful nature of the enterprise must be established by the government. He must know that he is violating a federal Internal Revenue statute. He need not know the particular statute involved by number or other designation, but he must know that he is violating the federal Internal Revenue Law. He need not know all the other conspirators, yet if he knows that there is a conspiracy and if he has knowledge of its basic objections and aims, and he joins it, then he adopts it as his own. A person becomes a member of the conspiracy by associating himself, however informally, with the common plan or scheme and knowing the central aim or principal reason for the overall plan and intending to aid in some significant manner, although it may be a minor way, to bring about the success of the unlawful enterprise.

## THE SUBSTANTIVE CHARGES

 Counts 2 to 13 apply only to the defendants Gisehaltz and Schwartz. They in substance state that on specific dates the defendants caused the preparation and presentation of false Information Returns, Forms 1099 Internal Revenue Service. It is alleged that the name, ad-

1. 26 U.S.C. § 7206(2).

dress and social security number of the recipient of the payment of the winning twin double tickets were false, in that the actual winner was someone other than the casher. Under the Internal Revenue Code, whoever aids and abets in a violation of the Code is guilty of a crime.[2] It makes no difference whether the falsity is with the knowledge and consent of the person authorized or required to present such return. Another Internal Revenue Code section provides in substance that the winner of over $600 shall report to the Internal Revenue Service the name and address of the recipient.[3] The essential elements of the substantive offenses are:

1. That on or about the dates alleged in each particular count, each defendant either assisted or procured or counselled or advised or caused the preparation or presentation of a return in connection with the matter arising under the Internal Revenue Laws;

2. That the said return was false or fraudulent as to a material matter, namely, the name, address and social security number of the winner;

3. That each defendant acted, unlawfully knowingly and wilfully.

### THE FACTS

The court finds from the credible testimony, beyond a reasonable doubt, that Pipitone, Beloff, Sandler, Missone and Yoselowitz, during 1964, cashed winning twin double tickets for a group which included Gisehaltz and Schwartz. The principal figure in the handling of the tickets was Gisehaltz.

The twin doubles at Yonkers and Roosevelt Raceways at the time in question operated as follows: The bettor bought a $2 ticket, in as many multiples as he desired, picking the winners of the 6th and 7th races. If he did so successfully, he had a "live" ticket and could bet on the winners of the 8th and 9th races. The odds against selecting all four winners are very great.

The agreement established by the credible evidence, beyond a reasonable doubt was that Gisehaltz and Schwartz would acquire winning twin double tickets and that Pipitone, Beloff or Missone would cash them, holding themselves out to be the winners of the winning twin double tickets presented, and for this service they were paid a commission. In Sandler's case he would buy the winning tickets from them at a discount. The court is convinced that Schwartz's testimony that he picked all his winners himself, is not worthy of belief.

### AS TO DEFENDANT GISEHALTZ'S CONNECTION WITH THE CONSPIRACY

Gisehaltz was the principal mover. He had known Schwartz since Schwartz was 12 or 13 years old. He met Pipitone and Beloff through his old friend Sam Yoselowitz in early 1964 at his place of business, when Beloff wanted to insure his car.

Schwartz, his brothers, and some other friends often sat with Gisehaltz at the track. They saw Pipitone and Beloff and Missone frequently.

The court finds from the credible evidence, beyond a reasonable doubt, that Gisehaltz gave or directed Schwartz to give to Pipitone, winning twin double tickets on or about March 12th and 17th, May 14th, June 6th, 13th, 15th and 20th, all in 1964. The court finds that he also gave tickets to Sandler on or about October 5th, 6th, 8th, 15th, 27th, 29th, 30th and 31st, 1964. The court also finds that after receiving the winning twin double tickets, Pipitone and Beloff went to the verification windows and supplied the necessary information for the verification forms, thus representing themselves as the true winners and received payment, and that thereafter they then gave the money received to Gisehaltz or Schwartz and that Gisehaltz paid them commissions for this service and that on some occasions he was observed by Pipitone to split the rest of the money with Schwartz. The court further finds that

---

2. 26 U.S.C. § 7206(2).

3. 26 U.S.C. § 6041(a).

Gisehaltz sometimes "sold" his winning tickets to Sandler for 96–98% of their face value, with the same intention, viz. of avoiding having to cash the tickets himself, and that then Sandler cashed the tickets as if he had been the original winner. The court further finds that late in 1964, Gisehaltz began to give his winning tickets to Missone to cash, and that Missone then signed the verification forms and received a commission in the same manner as Pipitone and Beloff had. The tracks filled out the required Internal Revenue Forms 1099 from each verification slip, kept one copy in their security departments, sent one to the Internal Revenue Service, one to the state tax department, and one to the individual winner named on the form.

The court has considered the interests of the various witnesses and of the defendant Gisehaltz. Beloff's motives in going voluntarily to the Internal Revenue Service are suspect. He stated that he was interested in getting a reward for uncovering the scheme. No reward in fact has been paid to him. Beloff, Pipitone and Sandler were accomplices as a matter of law. They were not named as defendants, but simply as co-conspirators. There is no doubt however, that they cashed substantial numbers of winning twin double tickets. Therefore, the inference is inescapable that they undoubtedly cashed them for somebody else. Why should Gisehaltz be singled out and accused? No previous malice existed between Gisehaltz and Pipitone or Beloff. Pipitone and Beloff would surely have wanted to point out the real operators in the possible hope of a reward. The claim of Gisehaltz that he was simply a "fall guy" is incredible. The court finds Pipitone's and Beloff's testimony credible and having found it credible, finds it overwhelming. The defendant Gisehaltz, of course, has a strong interest in the outcome of the case. He has had many honors and has been the head of his fraternal group, as well as his local precinct youth organization. He is married and has children and also has a legitimate business. His testimony how-ever, left much to be desired. His testimony that his Internal Revenue returns for several years before 1965 were filed by his accountant without his knowledge or understanding, and that he paid a tax on winnings of $1000 when in fact he did not win, is, to say the least, amazing. His explanation of the acquisition of his new home is incomprehensible unless he started to make money in sizeable amounts someplace, and the only logical inference is that he made it at the tracks. In his first 1964 Tax Return, he claimed that his income was $4,781.45. In his amended return for 1964, he claimed that his income was $5,781.45. In an application made that year for a mortgage loan on the $21,240.00 house he was buying, he said his base annual income was $15,000. The amended tax return included winnings at the track.

The court finds from the totality of all the evidence that Gisehaltz was a leading member of an illegal conspiracy which involved giving winning twin double tickets to "stand-ins" or cashers, for the purpose of defrauding the United States.

The alibi testimony is not persuasive because all of the dates involved are "on or about", and although an effort was made to pinpoint some of them, it is clear to the court that they were so variable as to make this defense of alibi unpersuasive as to the charge of conspiracy. The court has considered the character testimony submitted for Gisehaltz by Lodge members who reported that his reputation for honesty and trustworthiness is excellent. The court has considered this testimony together with all of the evidence in the case and finds, as to Count 1, that Gisehaltz was proven guilty by credible evidence beyond a reasonable doubt.

## THE DEFENDANT SCHWARTZ— AS TO THE CONSPIRACY

For the same reasons described in relation to Gisehaltz, the court finds that Gisehaltz and Schwartz turned over to Pipitone, Beloff and Sandler, winning twin double tickets for cashing. It is

incredible to this court that 10 years of losing, watching hoses break and recording times in the preliminary runs, made the defendant enough of an expert to enable him to pick 10 or 11 twin double winners within the time described in the indictment. The court is convinced that the reasonable inference is that he bought live tickets, despite his testimony that he picked all the winners himself. The court believes that he lied in his application for membership in the U. S. Trotting Association, claiming that he owned an interest in a registered harness horse. The comparison of the interests of the witnesses and the defendant, as discussed above in relation to the defendant Gisehaltz, has been resolved by the court in favor of the government's position. The court finds that Schwartz's guilt as to the conspiracy has been proven by credible evidence, beyond a reasonable doubt, even though the witnesses who established this are accomplices as a matter of law, and have not been named as defendants.

## AS TO DEFENDANT MISSONE

 Missone has been named in Count 1 only. The case against him has been considered only upon both his conduct and his declaration. Gisehaltz's alleged statement to Pipitone and Beloff that he was going to use Missone as a casher, has been disregarded as to Missone. It was considered as an admission by Gisehaltz in determining his guilt or innocence. The court finds that he did give twin double tickets to Pipitone and Beloff, pay them commissions for cashing them, and then in turn give the money to Gisehaltz and receive his own commission.

 Missone told Pipitone and Beloff that he was giving them Gisehaltz's tickets which he had been given to cash and that they should not tell Gisehaltz that they had cashed them. This statement is in the nature of an admission of his participation in the scheme, although of course it does not bind any-

one else. The argument that it was not established that he acted with knowledge of the federal Internal Revenue Law is sophistry. In 1964 he filled out 31 verification slips at Yonkers and collected about $78,000.00. In 1965 at Yonkers and Roosevelt, he filled out 22 verification slips and collected about $62,000. The government 1099 tax forms sent by the track to the winner named on every verification form, make it clear to the winner that his winnings involve him in a federal tax procedure. The court from all the credible evidence in the case finds that the government has established his guilt beyond a reasonable doubt.

## AS TO THE SUBSTANTIVE COUNTS

 Finding the witnesses Pipitone, Beloff and Sandler credible, the court finds that on May 14, 1964, June 6th, 13th, 15th and 20th, 1964, the defendant Gisehaltz as a principal turned over to Pipitone and Beloff winning twin doubles with the purpose of deceiving the Internal Revenue Service as to the true winner. The court further finds that Pipitone, Beloff and Sandler received a commission for filling out the verification forms representing themselves as the true winners, when in fact they were not. The court further finds that on these occasions, Schwartz aided and abetted Gisehaltz in these transactions. For the dates April 14th and 26th, 1965, May 1st, 15th and 29th, 1964 and June 26, 1964, the court finds that the evidence is insufficient to find beyond a reasonable doubt that either Gisehaltz or Schwartz gave twin double tickets to Pipitone, Beloff, Sandler or Missone to cash.

The court therefore finds the defendants Gisehaltz, Schwartz and Missone, guilty as charged in Count 1 and the defendants Gisehaltz and Schwartz guilty as charged in Counts 5, 9, 10, 11, and 12, and not guilty as to Counts 2, 3, 4, 6, 7, 8 and 13.

So ordered.