VOLVO NORTH AMERICA CORPORA-
TION, International Merchandising
Corporation, and Proserv, Inc., Plain-
tiffs,

v.

MEN'S INTERNATIONAL PROFES-
SIONAL TENNIS COUNCIL, M. Mar-
shall Happer, III and Philippe Chatrier,
Defendants.

No. 85 Civ. 2959 (KTD).

United States District Court,
S.D. New York.

Aug. 10, 1987.

Rogers & Wells, New York City, for plaintiff Volvo North America Corp.; James J. Maloney, of counsel.

Lloyd I. Isler, P.C., New York City, for plaintiff Intern. Merchandising Corp.

Williams & Connolly, Washington, D.C., for plaintiff ProServ, Inc.; Steven M. Umin, Robert S. Litt, Mark S. Kevinstein, of counsel.

Simpson Thacher & Bartlett, New York City, for defendants Men's Intern. Professional Tennis Council, M. Marshall Happer, III, and Philippe Chatrier; Roy L. Reardon, Charles E. Koob, Michael J. Chepiga, Mary Elizabeth McGarry, Julie R. Fenster, of counsel.

## MEMORANDUM & ORDER

KEVIN THOMAS DUFFY, District Judge:

The decision on this motion for summary judgment submitted in January of 1986 has been a long time in coming. The reason for this is that I had difficulty (as often happens) in articulating the obvious. Sometimes it is necessary to explain the obvious, something that district court judges are competent to do. *Cuisinarts, Inc. v. Robot-Coupe International Corp.*, 509 F.Supp. 1036, 1043 (S.D.N.Y.1981). It is necessary in this case.

When hiring an employee, an employer may make that employment dependent on certain conditions. Such conditions

may include length and hours of employment, rate of pay, vacation time, sick leave policies, and restrictions on whether the employee may work at other jobs, so long as they are not imposed for longer than a reasonable period of time. The employment contracts at issue bind the employee tennis players to such conditions for a period of approximately thirty-six weeks per year. The basic charge here is that these employment contracts for tennis players preclude the plaintiffs from hiring those players during that period, so that plaintiffs cannot successfully compete in exhibiting those players. Sophist arguments advanced by plaintiffs would turn this into an illegal monopoly and a violation of the antitrust laws. The real relief sought by plaintiffs is a declaration by this court that exclusive employment contracts even for a reasonable period of time monopolize the employees' time and are thus illegal. With this in mind, a more detailed recitation of the facts presented here is appropriate.

## FACTS

Plaintiffs, Volvo North America Corporation ("Volvo"), International Merchandising Corporation ("IMC"), and ProServ, Inc. ("ProServ"), bring this action against defendants, Men's International Professional Tennis Council ("MIPTC"), M. Marshall Happer, III, (MIPTC's Administrator), and Philippe Chatrier, (MIPTC's Chairman), alleging, *inter alia,* violations of the federal antitrust laws. Defendants now move: (1) to dismiss the entire complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, or, in the alternative, (2) to dismiss Volvo's fraud claims pursuant to Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity, and (3) to dismiss certain portions of the complaint pursuant to Fed.R.Civ.P. 12(b)(1) because they are not ripe for adjudication.

Defendant MIPTC is an unincorporated association that has, since 1974, organized and overseen the Grand Prix Circuit ("Grand Prix"), a series of men's professional tennis tournaments. Defendants Happer and Chatrier are officers of MIPTC. MIPTC is a nine-member council comprised of three representatives of the International Tennis Federation ("ITF"), three representatives of the players, one representative of the North American tournament directors, one representative of European tournament directors, and one representative of the directors of all other MIPTC-sanctioned tournaments. Plaintiff Volvo is a corporation principally engaged in the production of automobiles and trucks, but it also produces and sponsors men's professional tennis events. Plaintiffs IMC and ProServ are corporations engaged in the management of professional athletes, including men's professional tennis players. Both IMC and ProServ are also in the business of producing men's professional tennis events, and it is in this capacity that they bring this suit. Therefore this memorandum will deal with all three plaintiffs solely as producers of men's professional tennis events, and will not address IMC's and ProServ's status as player-agents.

The production of men's professional tennis events generally involves several parties. The "owner" of the event is obligated to pay the expenses of the event, including players' compensation and the facility costs where the event is played, and is entitled to receive revenues generated by the event. Often the owner contracts with other parties to handle some or all of the functions of producing the event, such as: player-agents, advertisers, parties to market television broadcast rights, sponsorship rights, concessions, programs, and other products associated with the event, or parties to manage the events' day-to-day operations.

Individual men's professional tennis events can involve several different sponsors. The "title" sponsor purchases the right to have its name included in the title of the event. The "presenting" sponsor purchases the right to have the event identified and advertised as "presented by" that sponsor. "Secondary sponsors" pay for other subsidiary sponsorship rights such as the right to have the sponsor's product identified and advertised as the "official product" of the event. Sponsorship rights usually also include such benefits as tickets to attend the event, the right

to post banners and distribute promotional materials at the event site, and to advertise in the event program.

From 1980 through 1984, Volvo purchased the rights to have its name identified as the overall sponsor of the Grand Prix. Other subsidiary sponsors also present and sponsor individual Grand Prix events. Although Volvo sponsored the Grand Prix, it did not assume responsibility for the management of the various events nor did it develop any of the tournament's rules. Apparently, MIPTC was responsible for sanctioning and scheduling all Grand Prix events. In January of 1984, Volvo sought to continue its sponsorship of the Grand Prix and submitted a sponsorship bid to MIPTC. Nabisco Brands, Inc. ("Nabisco") also submitted a bid to MIPTC to become the Grand Prix sponsor. On February 1, 1984, MIPTC announced that Nabisco would become the 1985 Grand Prix sponsor.

Because of Volvo's 1980 through 1984 Grand Prix sponsorship, and its assumption that its sponsorship would continue, it acquired contractual rights to the use of Madison Square Garden for the January 1985 Masters Tournament, and had contracted with NBC to televise the Masters Tournament during that week in future years. Because its Grand Prix sponsorship ended in 1984, Volvo contracted with MIPTC in 1985 (the "1985 Agreement") to assign its contracts with Madison Square Garden and NBC to MIPTC. In return, MIPTC agreed to sanction Volvo's subsidiary sponsorship of several individual Grand Prix events. Both MIPTC and Volvo agreed to cooperate with each other's reasonable promotional activities.

In July 1985, plaintiffs Volvo, IMC and ProServ initiated this action against defendants MIPTC and two of its officers. The complaint essentially alleges eight causes of action against the defendants. All three plaintiffs claim that defendants' acts constitute:

(1) a combination and conspiracy to restrain trade, and a group boycott in violation of the Sherman Act, 15 U.S.C. § 1 (1982 & Supp. III 1985);[1]

(2) a combination, conspiracy and attempt to monopolize trade in violation of the Sherman Act, 15 U.S.C. § 2 (1982);[2]

(3) interference with prospective business relationships; and

(4) unfair competition.

Plaintiff Volvo alleges that defendants' acts constitute the following causes of action against it individually:

(5) breach of MIPTC's bidding conditions for the 1985 Grand Prix sponsorship, and of the 1985 Agreement;

(6) fraud;

(7) defamation; and

(8) product disparagement.

*Claims Asserted by Volvo, IMC, and ProServ*

Plaintiffs' antitrust and unfair competition claims essentially hinge on their allegation that MIPTC has combined and conspired to monopolize and restrain trade and compete unfairly in men's professional tennis. Plaintiffs contend that they are current and potential competitors of MIPTC and that MIPTC is preventing them and

---

1. 15 U.S.C. § 1 provides that:
   [e]very contract, combination in the form of trust or otherwise, or consiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

2. 15 U.S.C. § 2 provides that:
   [e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

any other entity from creating and successfully operating an alternate tennis circuit to the Grand Prix. They assert that MIPTC is using three methods to accomplish this: (1) agreements with World Championship Tennis, Inc. ("WCT"); (2) the use of player-commitment contracts; and (3) the proposed implementation of certain rules. Plaintiffs also contend that defendants' antitrust conduct constitutes interference with prospective business relationships.

■■■■ The only co-conspirator named in the complaint is the ITF. The ITF formed MIPTC originally, participates in MIPTC's operation, and ITF members make up one-third of MIPTC. Because ITF makes up part of MIPTC, and because it is legally impossible to conspire with oneself, *United States v. Gisehaltz*, 278 F.Supp. 434, 437 (S.D.N.Y.1967), plaintiffs can make out no claim of conspiracy to restrain trade or to monopolize against ITF and MIPTC. Plaintiffs also allege that other co-conspirators exist, "some of whom may not be known to the plaintiffs at this time." First Amended Complaint, at ¶ 8. However, no conspiracy claim can stand against unidentified and unknown parties.

First, plaintiffs claim that WCT produced a series of tennis events competitive with the Grand Prix, and that defendants responded with anticompetitive actions against WCT, eventually reaching an agreement by which the MIPTC and WCT consented to coexist. Under the agreement, MIPTC gave WCT certain designated sanctioning and benefits in exchange for promises to restrict WCT's competition with MIPTC. Plaintiffs argue that this conduct has restricted the production of non-MIPTC-sanctioned events and has forced the majority of men's professional tennis events to apply to the MIPTC for sanctioning.

Plaintiffs next argue that the defendants exercise monopoly control over men's professional tennis players by way of contracts for their services. Players wishing to play in any MIPTC-sanctioned event must either sign a Commitment Agreement prescribed by MIPTC or, in some cases, play in a qualifying tournament. The Commitment Agreement requires any player ranked in the top one hundred men's singles players to participate in a minimum number of Grand Prix events, which effectively controls the players' performances for twenty-one weeks a year. Further, players must agree not to participate in any event not sanctioned by MIPTC which occurs during certain specified MIPTC-sanctioned events. These restrictions effectively controlled players abilities to perform elsewhere for fourteen weeks in 1985 and for sixteen weeks in 1986. Additional clauses prohibit participation in non-MIPTC-sanctioned events held within certain distances and times from MIPTC-sanctioned events. Thus, by signing a Commitment Agreement, a player commits approximately thirty-six weeks a year to playing in only MIPTC-sanctioned events. Plaintiffs argue that because all of the top one hundred professional men's tennis players have signed MIPTC Commitment Agreements, and because these players are necessary for any successful men's tennis event, defendants exercise a complete monopoly over the services of men's professional tennis players. Plaintiffs also cite the bonus pool system as evidence of defendants' monopoly over players' services. Under that system, all MIPTC-sanctioned events must contribute money to a bonus pool, from which prize money is awarded to players based on their cumulative performance in all MIPTC-sanctioned events. This prize money is awarded in addition to any prize money awarded for performances in individual sanctioned events.

Finally, plaintiffs allege that MIPTC has proposed four rules that have present anticompetitive impact and that, if enacted, would further restrain competition for production of men's professional tennis events. The four proposed rules are as follows:

1. The Special Event Rule would require that all parties affiliated with an MIPTC-sanctioned event not promote any non-sanctioned event during the forty-eight weeks a year occupied by sanctioned tournaments. Plaintiffs assert that this rule is currently deterring producers of both sanc-

tioned and non-sanctioned events, including plaintiffs, from making contracts for those events that extend into the future, for fear that they will be broken in compliance with the rule. Plaintiffs also argue that because it is not economically feasible to run a profitable event during the remaining four weeks of the year, any party associated with a sanctioned event, including plaintiffs, is precluded from producing any non-sanctioned events.

2. The Best Interest Rule would give MIPTC the right to refuse to sanction any event whenever it decided that sanctioning the event would not serve the best interest of the sport of tennis. Plaintiffs assert that any party that now owns or produces a sanctioned event, or that believes it might in the future, is coerced to comply with all of defendants' demands or else risk the refusal or withdrawal of MIPTC's sanction under this rule.

3. The Conflicts of Interest Rule would require that any player-agent involved in producing an MIPTC-sanctioned event must obtain MIPTC approval before awarding any player a wild card position in the event. Wild card positions are those awarded to players without regard to his ranking, and are usually awarded independently by the owners and producers of an event. Plaintiffs claim that present and future owners and producers of sanctioned events are deterred by this rule from contracting with player-agents, for fear that its enactment will cost that event either its sanction or its control over the selection of wild card players.

4. Mandatory Pooling of Television Broadcast Rights would require any event seeking MIPTC-sanctioning to make MIPTC its representative and agent for negotiating the sale of television broadcast rights to any televised event. Plaintiffs claim that such pooling is an unreasonable restraint of and an attempt to monopolize the sale of rights to broadcast men's professional tennis events. They also assert that the proposed rule is presently deterring television companies from contracting with individual sanctioned and non-sanctioned events, for fear of competition with

an MIPTC contract to broadcast a substantial package of sanctioned events.

*Claims Asserted Only by Volvo*

Volvo's breach of contract and fraud claims are based on its allegations that defendants breached the contracted bidding conditions for the 1985 Grand Prix sponsorship and the subsequent 1985 Agreement.

Volvo alleges that MIPTC agreed that no bid by any other sponsor applicant for the 1985 Grand Prix sponsorship would be accepted without allowing Volvo to match the offer, unless it exceeded Volvo's bid by at least 20 percent. Volvo also alleges that on more than one occasion during 1983 and 1984, representatives of MIPTC and Volvo agreed that MIPTC would give good faith consideration to Volvo's offers and MIPTC would keep all Volvo's bids confidential. Volvo claims that it has documentary evidence that MIPTC did not give good faith consideration to its bid, and that MIPTC revealed Volvo's bid to Nabisco prior to the time that Nabisco submitted its bid. Volvo asserts, that based on this information, Nabisco increased its bid, but for which Volvo would have been awarded the 1985 Grand Prix sponsorship. Volvo claims that this conduct constitutes a breach of the contracted bidding terms. In addition, Volvo sues the defendants for fraud, claiming that MIPTC representatives knowingly made false statements that MIPTC would keep Volvo's bids confidential, and would give them good faith consideration, for the purpose of using Volvo's offers to increase offers by other bidders.

Under the 1985 Agreement, Volvo and MIPTC agreed to cooperate with each other's reasonable promotional activities. For a number of years before the 1985 Agreement, Volvo used a logo on all of its tennis-related promotional materials depicting the Volvo name and a tennis ball resting against the head of a tennis racket. Beginning in late 1984, Volvo expanded its tennis sponsorship to include men's professional and intercollegiate tennis and recreational tennis leagues. Volvo used the logo described above in conjunction with the phrase "Volvo Tennis" to promote these tennis sponsorships. Volvo claims that on

March 13, 1985, defendant Happer sent letters to NBC Sports, Public Broadcasting Service ("PBS"), Entertainment and Sports Programming Network ("ESPN"), USA Network, and to unnamed tennis tournament owners and producers accusing Volvo of misleading the public and encouraging the belief that it continued to be the overall Grand Prix sponsor, or that it maintained a circuit within the Grand Prix, by its continued use of the logo it had used while it was the overall sponsor. The letters stated that Volvo continued to use the term Volvo Tennis and continued its participation in tennis sponsorship to mislead the public and to injure Nabisco's Grand Prix sponsorship. The letters to the television networks requested that they not permit the use of the Volvo logo during their broadcasts of any Grand Prix events. The letters to the tournament owners and producers requested that they not permit any Volvo Tennis banners to be displayed at their events, and threatened the possible withdrawal of their MIPTC sanction if they did not comply with the request. Volvo claims that these letters constitute violations of the provision of the 1985 Agreement to cooperate with Volvo's reasonable promotional activities. Further, Volvo sues the defendants for fraud, claiming that MIPTC representatives knowingly made false statements that MIPTC would cooperate with such reasonable promotional activities in order to induce Volvo to relinquish its rights to the Madison Square Garden and NBC contracts.

Volvo also claims that defendants' statements to media representatives and other event owners and producers, that Volvo was guilty of unfair competition in its continued tennis sponsorship, was deliberately misleading the public, and was intended to injure Nabisco's Grand Prix sponsorship, constitute defamation. Finally, Volvo claims that these statements constitute product disparagement of its tennis sponsorship program.

## DISCUSSION

The defendants move to dismiss plaintiffs' complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. For purposes of this motion, I "must accept the plaintiff[s'] well-pleaded allegations at face value, construe the allegations in the complaint in plaintiff[s'] favor, and dismiss the complaint only if 'it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim[s] that would entitle [them] to relief.'" *Aeronca, Inc. v. Gorin*, 561 F.Supp. 370, 375 (S.D.N. Y. 1983) (citations omitted) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)) (footnote omitted). In order to withstand a motion to dismiss, the complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under *some* viable legal theory." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1758, 84 L.Ed.2d 821 (1985) (quoting *In re Plywood Antitrust Litig.*, 655 F.2d 627, 641 (5th Cir.1981), *cert. dismissed*, 462 U.S. 1125, 103 S.Ct. 3100, 77 L.Ed.2d 1358 (1983)). I will consider each of plaintiffs' causes of action *seriatim* under this standard.

Plaintiffs allege antitrust claims under sections one and two of the Sherman Act.

[I]n the context of a 12(b)(6) challenge [to antitrust claims] the question is whether, if we accept all the allegations—including those relating to purpose and intent —as true, the plaintiffs have successfully pleaded a contract, combination, or conspiracy [to monopolize or] in restraint of trade within the meaning of the Sherman Act. The pleader may not evade these requirements by merely alleging a bare legal conclusion; if the facts "do not at least outline or adumbrate" a violation of the Sherman Act, the plaintiffs "will get nowhere merely by dressing them up in the language of antitrust." When the requisite elements are lacking, the costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the

events related in the complaint. A contrary view would be tantamount to providing antitrust litigation with an exemption from Rule 12(b)(6).

*Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d at 1106–07 (citations omitted) (quoting *Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 654 (7th Cir.1984)).

1. *Plaintiffs' Claim Under 15 U.S.C. § 1*

In a civil action under section 1 of the Sherman Act, plaintiffs must establish two essential elements: (1) that defendants entered into a "contract, combination ..., or conspiracy"; and (2) that that contract, combination, or conspiracy was "in restraint of trade or commerce among the several States." 15 U.S.C. § 1 (1982 & Supp. III 1985); *Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 78 (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). Forbidden restraints of trade "are defined generally as those activities where the anticompetitive effects outweigh the procompetitive effects." *Robinson v. Magovern,* 521 F.Supp. 842, 904 (W.D.Pa.1981), *aff'd without opinion,* 688 F.2d 824 (3d Cir.), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982). Certain business combinations are defined as *per se* unreasonable and illegal under section 1, without further inquiry. These include "price fixing, division of markets, group boycotts, and tying arrangements." *Id.* (citations omitted) (quoting *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958)).

Plaintiffs allege that defendants' conduct constitutes a group boycott, and is therefore a *per se* violation of section 1 of the Sherman Act. Neither a group boycott nor any facts to support such a *per se* violation are alleged in the complaint. In fact, a group boycott is not even mentioned in the factual allegations of the complaint, and is only briefly mentioned in the final listing of each count at the end of the seventy-three page document. While plaintiffs have not stated a cause of action for a *per se* violation of section 1, I must next consider whether plaintiffs have established some contract or combination which is an unrea-

sonable restraint of trade, where the anticompetitive effects outweigh the competitive effects. I have already discussed why no cause of action for conspiracy is made out in the complaint. Plaintiffs assert that the WCT–MIPTC agreement, the player Commitment Agreements, and the four proposed MIPTC rules constitute unreasonable restraints of the men's professional tennis market. I find that the facts set forth in the complaint do not make out such a claim.

■ Assuming that WCT did produce a series of men's tennis events independent of and competitive with those sanctioned by MIPTC, the fact that WCT contracted with MIPTC does not constitute an unreasonable restraint of trade in and of itself. That the WCT created a tennis event series competitive with MIPTC suggests that other parties could do the same. In addition, the fact that MIPTC made an offer sufficiently beneficial to WCT to convince it to apply for MIPTC sanctioning in no way precludes any other party from creating an independent, competitive tennis event series. Plaintiffs conclude that this agreement has forced the majority of men's professional tennis events to apply for MIPTC sanctioning, and that this constitutes a section 1 violation. The facts simply do not bear this out. Neither the fact that the financial costs of creating a competitive tennis event series are high, nor that such a series has not been created since the WCT–MIPTC agreement constitute an antitrust violation.

■ Plaintiffs next cite the player Commitment Agreements and bonus pool system as section 1 violations. The player Commitment Agreements are essentially employment contracts that require employee players to play only for MIPTC for thirty-six weeks a year. Employers may impose reasonable employment conditions for a reasonable period of time. Even accepting plaintiffs' assertion that creating an independent tennis event series is not feasible during the remaining weeks of the year, I cannot find that an exclusive employment contract for thirty-six weeks a year is imposed for an unreasonable length

of time. The fact that MIPTC contracts for exclusive use of players' personal services does not constitute an illegal restraint of trade in those services. Similar contracts have been upheld in other situations involving athletic performances. *Madison Square Garden, Inc. v. Shavers,* 434 F.Supp. 449, 450 (S.D.N.Y.1977) (non-competition clause in athlete's contract to participate in a championship boxing match upheld). Plaintiffs are free to contract with the top-ranked men's tennis players for their services after their current MIPTC contracts expire. Plaintiffs complain that they will have to pay more for those players' services. First Amended Complaint, at ¶ 54. In other words, plaintiffs must compete with MIPTC for the services of those top-ranked players. The fact that MIPTC's existence makes that competition more expensive for plaintiffs is insufficient to establish a section 1 violation.

■ The bonus pool system is simply a condition of the MIPTC sanctioning arrangement, and a benefit offered to induce tennis players to sign Commitment Agreements. It in no way prevents plaintiffs from obtaining contracts with those players by making them a better offer.

■ Finally, plaintiffs assert that the four proposed MIPTC rules constitute section 1 violations. Plaintiffs complain that the Special Events Rule would effectively prohibit any participant in a MIPTC-sanctioned event from producing any non-sanctioned event. If enacted, the Special Events Rule would be essentially a condition of the MIPTC sanctioning arrangement. Assuming that the rule prevents parties from producing both sanctioned and non-sanctioned events, it in no way bars a competitor from creating a competitive tennis event or series of events independent of MIPTC sanctioning.

Plaintiffs assert that the Best Interest Rule unfairly coerces any party wishing to participate in an MIPTC-sanctioned event to comply with all of MIPTC's demands. If enacted, the Best Interest Rule would also be a condition of the MIPTC sanctioning arrangement. While the rule might deter-

mine to whom MIPTC agrees to grant sanctioning, like the Special Events Rule it has no bearing on whether or not a competitor can create an independent tennis event or series of events.

Plaintiffs argue that the Conflicts of Interest Rule is deterring present and future events owners and producers from contracting with player-agents, and that this constitutes a section 1 violation. Rather, the rule, if enacted, would be a condition of the MIPTC sanctioning arrangement that addresses a very specific situation. When the owner or producer of a sanctioned event is also a player-agent, a potential conflict of interest exists regarding the award of wild card positions to players; the obvious temptation is that the owner or producer will award wild card positions to players he represents in his role as player-agent. When that situation arises in the context of an MIPTC-sanctioned event, the rule would grant MIPTC final approval of the wild card players. Such a contractual condition of the sanctioning arrangement is unrelated to a competitor's ability to create an independent tennis event or series of events, and therefore does not constitute an antitrust violation under section 1.

Finally, plaintiffs protest that the proposed rule requiring mandatory pooling of television broadcast rights would constitute an unreasonable restraint in the sale of rights to broadcast men's professional tennis events. Once again, this rule, if enacted, constitutes a condition internal to the MIPTC-sanctioning arrangement and unrelated to a competitor's ability to create an independent tennis event or series of events and to negotiate the sale of rights to broadcast those events.

### 2. *Plaintiffs' Claim Under 15 U.S.C. § 2*

■ Plaintiffs next assert that the WCT–MIPTC agreement, the player Commitment Agreements, and the four proposed MIPTC rules constitute a willful acquisition and maintenance of monopoly power over men's professional tennis in violation of section 2 of the Sherman Act. "The offense of monopoly under section 2 of the Sherman Act has two elements: (1)

the possession of monopoly power in the relevant market, and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). The relationships between and development of the MIPTC, WCT, and ITF are described in the First Amended Complaint, and are a consequence of the recent historical development of the sport of men's professional tennis. Furthermore, MIPTC does not possess an illegal monopoly power in the men's professional tennis market. Nothing other than perhaps economics bars any of the plaintiffs from entering the market for men's professional tennis events. However, plaintiffs are unwilling to compete in that market. Because they are unwilling to expend the funds necessary to enter the market, plaintiffs claim that MIPTC has a monopoly power, which assertion is not borne out by the facts alleged in the Complaint.

Courts have recognized that the ability to restrict the supply of talented athletes may in some instances constitute anticompetitive behavior. In *Philadelphia World Hockey Club, Inc. v. Philadelphia Hockey Club, Inc.,* 351 F.Supp. 462, 508 (E.D.Pa. 1972), the court held that the interlocking agreements developed by the National Hockey League ("NHL") to control hockey players' careers were unreasonable, and constituted a violation of section 2 of the Sherman Act. In that case, the Standard Players' Contract reserve clause constituted a perpetual option granting the NHL virtual control over a player's entire career, if it decided to exercise that option. *Id.* at 509. The facts presently at issue involve control over a player's services for independent periods of thirty-six weeks, and are so different from the NHL perpetual option as to make the *Philadelphia* case clearly inapplicable to the present facts.

### 3. *Plaintiffs' Claim of Tortious Interference with Prospective Business Relationships*

■ Plaintiffs allege that MIPTC's conduct constitutes tortious interference

with prospective business relationships. In order to make out such a *prima facie* claim, plaintiffs must allege the following elements:

(1) business relations existing between plaintiffs and a third party;

(2) defendants' interference with those business relations;

(3) either defendants' sole intent to harm plaintiffs by that interference, or defendants' use of means that are dishonest, unfair, or improper; and

(4) the harmful impact of defendants' behavior on plaintiffs, identifying the contract that would have been entered into but for defendants' interference.

*Martin Ice Cream Co. v. Chipwich, Inc.,* 554 F.Supp. 933, 945 (S.D.N.Y.1983); *El Greco Leather Prods. Co. v. Shoe World, Inc.,* 623 F.Supp. 1038, 1044 (E.D.N.Y. 1985), *rev'd in part on other grounds,* 806 F.2d 392 (2d Cir.1986). Plaintiffs here make a conclusory allegation, but present no factual allegations to support it. Plaintiffs do not allege business relations existing between them and a third party that were harmed by defendants' behavior. Neither do plaintiffs allege the contract or contract negotiations to establish a competitive tennis events series that would have been consummated but for defendants' behavior. Moreover, plaintiffs fail to make sufficient allegations that defendants' conduct was intended solely to harm them or was in any way improper. Therefore, plaintiffs' cause of action for interference with prospective business relationships cannot stand.

### 4. *Plaintiffs' Claim of Unfair Competition*

■ Plaintiffs allege that defendants' conduct constitutes common law unfair competition. The tort of unfair competition is "generally described as a misappropriation of the skill, expenditures, and labor of another. 'One cannot sell his product by misappropriating the good will of another through misleading the public into thinking that it is "sponsored" by or derived from

something else.'" *American Footwear Corp. v. General Footwear Co., Ltd.*, 609 F.2d 655, 662 (2d Cir.1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1601, 63 L.Ed.2d 787 (1980) (citations omitted) (quoting *Ideal Toy Corp. v. Kenner Prods. Div. of General Mills Fun Group, Inc.*, 443 F.Supp. 291, 305 (S.D.N.Y.1977)). An element of bad faith is essential to this notion. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980). In order to make out a cause of action for unfair competition, a complaint must set forth: "(1) the acts or omissions by defendants that proximately caused the misappropriation and (2) the property or benefit misappropriated—mere allegations that [plaintiffs have been harmed] will not suffice." *Bunch v. Artec Int'l Corp.*, 559 F.Supp. 961, 972 (S.D.N.Y. 1983). It is unclear to me how the WCT–MIPTC Agreement, the player Commitment Agreements, and the four proposed MIPTC rules could constitute common law unfair competition. Plaintiffs fail to allege any act of misappropriation or omission by defendants, and nowhere identify what skill, expenditures, labor, property, or benefit defendants have misappropriated from them. Therefore, the First Amended Complaint fails to state a cause of action for unfair competition.

### 5. *Volvo's Breach of Contract Claims*

██ Volvo presents sufficient allegations to support its claims for breach of contract against a motion to dismiss. Volvo alleges that defendants breached the contracted bidding conditions for the 1985 Grand Prix sponsorship, and the provision of the 1985 Agreement between MIPTC and Volvo to cooperate with each other's reasonable promotional activities. While it appears that complete diversity between the parties exists to support federal diversity jurisdiction over these claims, Volvo neither pleads that "the matter in controversy exceeds the sum or value of $10,000", as required by 28 U.S.C. § 1332(a) (1982), nor pleads any specific amount of damages suffered. Therefore these claims are dismissed with leave to replead.

### 6. *Volvo's Claim of Fraud*

██ Defendants move to dismiss Volvo's fraud claim for failure to plead the circumstances constituting fraud with particularity, as required by Fed.R.Civ.P. 9(b). That rule requires that Volvo must allege not only the elements of a fraud claim, but also state "the time, place and manner in which the allegedly false representations were made, [and] the identity of the person[ (s) ] making the alleged misrepresentation[ (s) ]. This pleading is [required in order] to inform defendant[ (s) ] of the claim against [them] and the acts relied upon as constituting the fraud charge." *Fraser v. Doubleday & Co.*, 587 F.Supp. 1284, 1289 (S.D.N.Y.1984) (citations omitted). "A contractual promise made with the undisclosed intention not to perform it constitutes fraud." *Perma Research and Dev. Co. v. Singer Co.*, 410 F.2d 572, 575 (2d Cir.1969) (quoting *Sabo v. Delman*, 3 N.Y.2d 155, 162, 164 N.Y.S.2d 714, 718, 143 N.E.2d 906, 909 (1957)). "The essential elements of such a claim are (1) representation of a material existing fact; (2) falsity of the statement; (3) scienter; (4) deception; and (5) injury." *Songbird Jet Ltd., Inc. v. Amax Inc.*, 581 F.Supp. 912, 925 (S.D.N.Y. 1984). Volvo alleges that defendants knowingly made false statements that they would keep Volvo's bid for the 1985 Grand Prix sponsorship confidential, that they would give Volvo's sponsorship bid good faith consideration, and that they would promote Volvo's reasonable promotional activities in exchange for Volvo's rights under its contracts with Madison Square Garden and NBC. Volvo also alleges its reliance on these false statements and its resultant harm. Assuming that these allegations make out the essential elements of a fraud cause of action, the complaint fails to set forth the specific false representations alleged; and when, where, how, and by whom they were made. Therefore, Volvo's fraud claim must be dismissed for failure to comply with the requirements of Fed.R.Civ.P. 9(b). Leave to replead these claims, however, is granted.

### 7. *Volvo's Claim for Defamation*

██ Volvo asserts that defendants' statements to media representatives and

other event owners and producers constitute defamation. Volvo alleges that defendants made the following defamatory statements: (1) Volvo was guilty of unfair competition in its continued tennis sponsorship; (2) Volvo was deliberately misleading the public into believing that it continued to be the overall Grand Prix sponsor; and (3) Volvo's continued tennis sponsorship was intended to injure Nabisco's Grand Prix sponsorship. In order to state a *prima facie* cause of action for defamation, Volvo must plead that defendants "(1) negligently or willfully uttered a (2) defamatory statement (3) of or concerning the plaintiff (4) to a third person (5) which resulted in damage to plaintiff's reputation." *Carto v. Buckley*, 649 F.Supp. 502, 505 n. 1 (S.N.D.Y. 1986). In defamation actions, "the false and defamatory matter should be pleaded *in haec verba*." *Foltz v. Moore McCormack Lines*, 189 F.2d 537, 539 (2d Cir. 1951); *Herbert v. Lando*, 603 F.Supp. 983, 990 (S.D.N.Y.1985). In *Foltz*, the plaintiff paraphrased the allegedly false statements in the pleadings, as did Volvo here, which the court held was insufficient to state a cause of action for defamation. *Foltz v. Moore McCormack Lines*, 189 F.2d at 539. Assuming that Volvo sufficiently stated a cause of action for defamation, the allegedly defamatory statements are not set forth in any of Volvo's papers. Therefore the defamation claim must be dismissed. Again, leave to replead these claims is granted.

### 8. *Volvo's Claim for Product Disparagement*

■ Volvo claims that the same statements that constitute defamation also constitute product disparagement of its tennis sponsorship program. In order to state a *prima facie* cause of action for product disparagement, Volvo must plead: (1) that defendants made the allegedly disparaging statements with "knowledge of the alleged false statement or reckless disregard as to the truth of the statement", *Charles Atlas, Ltd. v. Time–Life Books, Inc.*, 570 F.Supp. 150, 154 (S.D.N.Y.1983); and (2) special damages. "Special damage is the pecuniary loss resulting directly from the effect of [defendants'] allegedly wrongful conduct," *id.* at 155, including all the expenses necessary to counteract the allegedly wrongful conduct and loss of sales. While Volvo alleges that defendants made the allegedly disparaging statements with malice, it has made no allegations that it has suffered special damages as a result of those statements. Therefore, Volvo's claim for product disparagement must be dismissed.

In sum, counts one through seven and thirteen of plaintiffs' complaint are dismissed. Counts eight through twelve are dismissed with leave to replead. Because plaintiffs' antitrust claims are dismissed, I need not consider defendants' motion to dismiss portions of the complaint as not ripe for ajudication.

SO ORDERED.