VOLVO NORTH AMERICA CORPORA-
TION, International Merchandising
Corporation, and ProServ, Inc., Plain-
tiffs–Appellants,

v.

MEN'S INTERNATIONAL PROFES-
SIONAL TENNIS COUNCIL, M. Mar-
shall Happer, III, and Philippe Chatri-
er, Defendants–Appellees.

MEN'S INTERNATIONAL PROFES-
SIONAL TENNIS COUNCIL and M.
Marshall Happer, III, Counterclaim-
ants,

v.

VOLVO NORTH AMERICA CORPORA-
TION, International Merchandising
Corporation, and ProServ, Inc., Coun-
terclaim–Defendants,

v.

Donald L. DELL, Raymond S. Benton,
Dell, Benton & Falk, Mark H. McCor-
mack, International Merchandising
Group, International Management Inc.,
Transworld International Inc., and A.B.
Volvo, Additional Counterclaim–De-
fendants.

Nos. 1201 to 1203, Dockets 87–7776,
87–7778 and 87–7784.

United States Court of Appeals,
Second Circuit.

Argued May 9, 1988.

Decided Aug. 30, 1988.

James J. Maloney, New York City (Michael F. Coyne, Donald P. Alexander, Nancy A. Brown, James C. Oschal, Rogers & Wells, New York City, of counsel), for plaintiff-appellant Volvo North America Corp.

Robert S. Litt, Washington, D.C. (Steven R. Kuney, Mark S. Levinstein, William R. Murray, Jr., Glenn J. Pfadenhauer, Williams & Connolly, Washington, D.C., of counsel), for plaintiff-appellant ProServ, Inc.

Lloyd I. Isler, New York City (Lloyd I. Isler, P.C., New York City, of counsel), for plaintiff-appellant International Merchandising Corp.

Charles E. Koob, New York City (Roy L. Reardon, Michael J. Chepiga, Mary Elizabeth McGarry, Jay S. Handlin, Jodi S. Balsam, Simpson Thacher & Bartlett, New York City, of counsel), for defendants-appellees.

Before KAUFMAN, PIERCE, and ALTIMARI, Circuit Judges.

PIERCE, Circuit Judge:

This is an appeal from so much of an order entered in the United States District Court for the Southern District of New York, Kevin Thomas Duffy, *Judge,* as dismissed Counts One through Seven of an amended complaint filed by appellants Volvo North America Corporation ("Volvo"), International Merchandising Corporation ("IMC"), and ProServ, Inc. ("ProServ"), for failure to state a claim upon which relief can be granted. *See Volvo N. Am. Corp. v. Men's Int'l Professional Tennis Council,* 678 F.Supp. 1035 (S.D.N.Y.1987), *appeal dismissed in part,* 839 F.2d 69 (2d Cir.1988). Counts One through Five allege that appellees, the Men's International Professional Tennis Council ("MIPTC"), its chairman, Philippe Chatrier, and its administrator, M. Marshall Happer, III, have conspired in violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982), to monopolize and restrain trade in the markets for the production of men's professional tennis events, the tennis-playing services of men's professional tennis players, and the rights to broadcast men's professional tennis events. Counts Six and Seven allege pendent state law claims for tortious interference with prospective business relations and unfair competition. For the reasons stated below, we vacate the dismissal of certain of appellants' antitrust and common law claims and remand with instructions to dismiss these claims with leave to replead; and we reverse as to the remaining claims on appeal.

I

A. *The Business of Men's Professional Tennis*

According to the amended complaint, the production of a men's professional tennis event requires: (1) selecting a site and arranging for a suitable facility for the event; (2) marketing the event; and (3) raising revenue to cover the costs of the event through the sale of sponsorship rights, the sale of tickets to attend the event, the sale of concessions, programs, or other products

at the event, and the sale of rights associated with the event, including the rights to broadcast the event on television. The production of a men's professional tennis event often involves several different participants. The "owner" of the event is the person or entity that is obligated to pay the expenses of the event, including compensation to the players and the costs for the facility or site where the event is played, and that is entitled to receive the revenues generated by the event. Frequently, the owner of an event will contract with a third person, such as a player-agent, to advertise or market the event or certain rights associated with the event, or to manage the day-to-day operation of the event. An event also may have several different "sponsors," including: (a) a title sponsor, which purchases the right to have its name included in the title of the event; (b) a presenting sponsor, which purchases the right to have the event identified and advertised as an event that is "presented by" this sponsor; and (c) secondary sponsors, which pay for specific subsidiary sponsorship rights, such as the right to have the sponsor's product identified as the official product of the event. Volvo is an owner, producer, and sponsor of certain men's professional tennis events. IMC and ProServ own and produce certain tennis events, and also provide representational and management services to men's professional tennis players.

At the present time, men's professional tennis events fall into one of two categories. The first category consists of events that are sanctioned by either MIPTC or the International Tennis Federation ("ITF"). These events include the Davis Cup events and the "Grand Prix" events; the latter consist of (1) the four "Grand Slam" tournaments, that is, Wimbledon, the U.S. Open, the French Open, and the Australian Open; (2) the Masters Tournament; (3) the World Championship Tennis Finals; (4) "Super Series" events; (5) "Regular Series" events; and (6) "Open Week Series" events. The second category consists of tournaments known as "Special Events," which include all events other than MIPTC- or ITF-sanctioned events and the Davis Cup events. Until recently, Volvo owned, produced, and sponsored only sanctioned events; IMC and ProServ, on the other hand, have owned and produced both sanctioned events and Special Events.[1]

### B. The Recent History of Men's Professional Tennis

#### 1. ITF, WCT, and MIPTC

The amended complaint alleges that, up until the late 1960's, only amateur tennis players were allowed to compete in the prestigious men's tennis tournaments sanctioned by ITF, a governing body that consists of various national tennis associations, including the United States Tennis Association. In the late 1960's, however, a rival organization, World Championship Tennis, Inc. ("WCT"), began sponsoring a series of men's *professional* tennis tournaments to compete with the events sanctioned by ITF. A substantial number of top men's tennis players thereafter turned professional and began to participate in WCT-sponsored events. In response, ITF eventually changed its rules to permit professional players to compete in ITF-sanctioned tournaments. In 1974 ITF joined in establishing MIPTC, which currently consists of nine members: three members representing ITF; three members representing men's professional tennis players; and three members representing men's professional tennis tournament directors. As noted above, MIPTC sanctions and schedules the tournaments that comprise the Grand Prix.

From 1974 to 1981, MIPTC increased the number of its Grand Prix events from fifty to ninety. At the same time, MIPTC began to require men's professional tennis players, as a condition of their participation in any Grand Prix event, to execute "Commitment Agreements" which required the players to participate in a minimum number of Grand Prix events, and to limit their

---

1. On appeal, Volvo claims that, since this litigation was commenced, it has become the owner of one Special Event.

participation in events not sanctioned by MIPTC. As a result, WCT agreed to obtain MIPTC sanctions for its entire circuit of events. By 1981, WCT owned eight Grand Prix events sanctioned by MIPTC.

## 2. The MIPTC–WCT Agreement

In 1981, a dispute arose between MIPTC and WCT over the terms and conditions of WCT's continued participation in the Grand Prix. WCT withdrew from the Grand Prix in April, 1981, and unsuccessfully attempted to establish its own independent tennis circuit for 1982. WCT thereafter commenced an action in the United States District Court for the Southern District of New York, alleging that MIPTC, ITF, and the Association of Tennis Professionals had violated the antitrust laws by engaging in a combination to monopolize the production and presentation of championship caliber men's professional tennis throughout the world. The lawsuit was settled in the fall of 1983, and WCT events were integrated into the Grand Prix. The resulting agreement (the "MIPTC–WCT Agreement") provided, *inter alia,* that: (1) MIPTC would sanction a specified minimum number of WCT tournaments; (2) MIPTC would give the WCT tournaments scheduling and sanctioning protection and priority; (3) WCT would not sponsor, own, or promote any Special Event or Grand Prix event that might adversely affect another Grand Prix event without prior MIPTC approval; (4) if certain conditions were satisfied, WCT would terminate its involvement in the business of acting as an agent or representative of men's professional tennis players; (5) if WCT decided to operate its WCT Tournament of Champions or its WCT World Doubles Championship as Special Events, MIPTC would (a) exempt these events from all Special Event restrictions, (b) continue to grant these events scheduling priority, and (c) exempt all players from any rules that would restrict their participation in these events; (6) MIPTC would limit the number of events it would sanction; (7) MIPTC would alter the players'

Commitment Agreements to require all players who qualified to participate in the WCT Finals; (8) MIPTC would increase the minimum number of MIPTC-sanctioned events in which players would be required to participate; (9) MIPTC would use its power over the services of men's professional tennis players to encourage players to participate in both WCT and other MIPTC events; (10) MIPTC and WCT would fix minimum and maximum levels of compensation to be offered to players at WCT events; and (11) MIPTC rules would be altered to provide that no Super Series event would be held in the same week as a WCT event.[2]

## 3. Volvo's Involvement with Men's Professional Tennis

Volvo began its involvement in professional tennis in 1973 with a small tournament in New Hampshire known as the Volvo International Tennis Tournament. Volvo began producing and sponsoring the Washington, D.C. Volvo Classic tennis tournament in 1975 and the Volvo Tennis Games in Palm Springs, California in 1979. Late in 1979 Volvo agreed to become the overall sponsor of the entire series of Grand Prix tournaments for the years 1980, 1981, and 1982, with the option to sponsor the Grand Prix for 1983 and 1984. Volvo exercised its option to continue sponsoring the Grand Prix in 1983 and 1984, and offered to continue its overall sponsorship of the Grand Prix into the future. However, in February, 1984, MIPTC announced that it was awarding the Grand Prix sponsorship for 1985 to Nabisco Brands, Inc.

Relations between Volvo and MIPTC began to sour shortly after MIPTC chose to award the Grand Prix sponsorship to Nabisco. For several years the Masters Tournament, the final event of the annual Grand Prix series, had been held in Madison Square Garden in the week following professional football's Super Bowl. Although Volvo's right to sponsor the Grand

---

2. According to an article recently published in the New York Times, MIPTC plans to drop the tournaments run by WCT in 1990, "as part of the council's plan to streamline the grand prix tour, which now numbers 79 tournaments." N.Y. Times, Aug. 9, 1988, at B10, col. 1.

Prix was to end in 1984, Volvo had acquired contractual rights to the use of Madison Square Garden for the Masters Tournament week in January, 1985. Volvo also entered into contractual commitments with the National Broadcasting Company ("NBC") for the televising of a men's professional tennis event during that week in future years. In response, appellee Philippe Chatrier, chairman of MIPTC, sent a letter to Volvo claiming that Volvo's negotiation of these contracts was legally improper and unethical. In January, 1985, Volvo agreed to assign its rights under the contracts with Madison Square Garden and NBC to MIPTC. In return, MIPTC agreed to approve Volvo's application for a sanction for the production of a tennis event at a site to be selected by Volvo, on the condition that Volvo sponsor no Special Events in North America during weeks in which Grand Prix tournaments were being conducted or in any city in which a Grand Prix event was held. In addition, the contract provided that MIPTC and Volvo would cooperate with each other's reasonable promotional activities.

Volvo claims, however, that despite the foregoing agreement to cooperate, appellee M. Marshall Happer, III, the administrator of MIPTC, embarked on a campaign to "dissuade and intimidate" tournament owners and producers from associating with Volvo or permitting Volvo to participate in the ownership, production, and sponsorship of Grand Prix events. Volvo also alleges that Happer sent letters to NBC Sports, Public Broadcasting Service, ESPN (a cable television sports network), and USA Network claiming that Volvo was attempting to mislead the public into believing that it was still the overall sponsor of the Grand Prix. Happer requested that the networks not permit Volvo to use its logo, a depiction of a tennis ball resting against the head of a racket, during their telecasts of any Grand Prix events.

### C. The Litigation

In April, 1985, Volvo filed a complaint in the United States District Court for the Southern District of New York, alleging federal antitrust and common law claims against MIPTC, Chatrier, and Happer. In September, 1985, IMC and ProServ, two sports management companies that provide representational and management services to tennis players and produce and own certain men's professional tennis events, joined Volvo as plaintiffs when an amended complaint was filed.

The amended complaint alleges, *inter alia,* that appellees have violated §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 (1982), by conspiring to monopolize and restrain trade in the market for men's professional tennis. Appellants claim that this market includes: (1) the submarket for the production of men's professional tennis events; (2) the submarket for the tennis-playing services of men's professional players; and (3) the submarket for the rights to broadcast men's professional tennis events on television in the United States. Appellants identify several ways in which MIPTC allegedly has violated the Sherman Act.

First, appellants allege that MIPTC's administration of the Grand Prix has violated the Sherman Act in at least three ways. The amended complaint states that appellants, in their capacity as owners and producers of sanctioned events, "have been denied the opportunity to produce tennis events in the manner they seek, with respect to matters such as site location, player compensation and scheduling." With respect to player compensation in particular, the amended complaint states that MIPTC will not sanction a tournament unless the owner agrees to a ceiling on player compensation.

Next, appellants claim that MIPTC has "further inhibited the development of events that could compete effectively with them by coercing WCT to agree, in the MIPTC–WCT Agreement, not to own or become involved in promoting any Special Event that adversely affects any MIPTC-sanctioned event, without prior approval from the MIPTC." Appellants also assert that "the MIPTC–WCT Agreement gave the WCT competitive advantages, and used the MIPTC's monopoly power to benefit the WCT," insofar as the Agreement "included covenants not to compete and agree-

ments between horizontal competitors to divide markets, fix prices, limit output, and limit outside competition."

Further, appellants contend that MIPTC has decreased the number of non-sanctioned tournaments in which players may compete by requiring all players who wish to participate in Grand Slam events to sign Commitment Agreements which include certain restrictive provisions. A player signing a Commitment Agreement agrees to participate in a minimum of fourteen Grand Prix events, and in the Masters Tournament or the WCT Finals, if he so qualifies. According to appellants, this restriction prevents players from competing in non-sanctioned tournaments for up to twenty-one weeks out of the year. The player also agrees not to participate in any Special Event that is held in the same week as, *inter alia*, a Grand Slam event, the Masters Tournament, or the WCT Finals. According to appellants, this requirement prevents players from participating in Special Events during sixteen weeks out of the year. In addition, the player agrees not to participate in any Special Event that is held within thirty days of a Grand Slam event, the Masters Tournament, the WCT Finals, or any Super Series event if the Special Event is held within one hundred miles of that event. And still further, no player may participate in more than four Special Events that are held during the same week and on the same continent as one of the MIPTC Super Series events.

Appellants also allege that MIPTC requires the owners and producers of sanctioned events to agree to contribute to a "bonus pool," which provides additional compensation to players who perform well at sanctioned events throughout the course of the year. This latter requirement provides players with an additional incentive to maximize their participation in sanctioned events.

Finally, appellants claim that certain *proposed* restrictions would further limit their

ability to compete in the market for men's professional tennis events. Among these proposed rules is a "Special Event" Rule, which would require all owners, agents, consultants, and associates of a sanctioned event to agree not to "promote" any Special Event during the week of any Grand Prix tournament. Since Grand Prix tournaments occupy forty-eight weeks of the year, this rule allegedly would preclude any person associated with an existing sanctioned event from producing *any* Special Events at all. There is also a proposed rule, known as the "Best Interest" Rule, which would give MIPTC the right to refuse to sanction any event whenever "in the sole judgment of the MIPTC" sanctioning that event would not serve "the best interest of the sport." Another proposal, the "Conflicts of Interest" Rule, would allow MIPTC to prohibit owners and producers from inviting certain players to participate in their tournaments as "wild cards." [3] And last, there is a proposed rule that would permit MIPTC to serve as the exclusive representative and agent for the pooled sale of television broadcasting rights to sanctioned events.

Appellants claim that, as a result of the foregoing restrictions, they have been injured in their capacities as owners and producers, or potential owners and producers, of Special Events, as well as in their capacities as owners and producers of sanctioned events. IMC and ProServ claim that MIPTC's rules have injured them in their capacities as owners and producers of Special Events in three ways: by restricting the ability of IMC and ProServ to obtain a sufficient supply of players' services for Special Events; by causing them to own and produce fewer Special Events than they otherwise would have owned and produced; and by causing the Special Events which they *do* own or produce to have been less profitable than they otherwise would have been. Volvo claims that it has been

---

**3.** According to the amended complaint, "[m]ost decisions about which players will be allowed to participate in the various MIPTC-sanctioned events are made on the basis of the players' rankings," but "from three to eight spots are left open for the owners and producers of the event to invite anyone they choose. These discretionary entry positions are referred to as 'Wild Cards.'"

injured in similar fashion, but only in its capacity as a *potential* owner and producer of Special Events. All three appellants claim that they have been injured in their capacities as owners and producers of MIPTC-sanctioned events, primarily because compliance with the foregoing rules has limited their ability "to compete freely and vigorously with the events owned and produced by the defendants and their co-conspirators."

Five counts of the complaint set forth appellants' various theories of antitrust liability. Count One of the complaint states that appellees' activities constitute a group boycott of, and a concerted refusal to deal with, owners, producers, sponsors, player-agents, and players who refuse to agree to abide by the terms and conditions prescribed by appellees, in violation of § 1. Count Two alleges that the foregoing rules are part of, and in furtherance of, a combination and conspiracy unreasonably to restrain trade in men's professional tennis, in violation of § 1. Count Three alleges that appellees' activities constitute the willful acquisition and maintenance of monopoly power, in violation of § 2. Count Four states that appellees' conduct demonstrates an attempt to monopolize, in violation of § 2, and Count Five alleges a conspiracy to monopolize, also in violation of § 2. Appellants also allege that MIPTC has tortiously interfered with their prospective business relations (Count Six), and has engaged in unfair competition (Count Seven). In addition, Volvo states claims for breach of contract, fraud, defamation, and product disparagement (Counts Eight through Thirteen).

In response, appellees filed a motion to dismiss the amended complaint on several grounds: they sought to dismiss appellants' challenge to the *proposed* MIPTC rules pursuant to Fed.R.Civ.P. 12(b)(1) on the ground that this challenge was not ripe; they sought to dismiss the antitrust claims pursuant to Fed.R.Civ.P. 12(b)(6) on the ground that appellants had not adequately alleged antitrust injury; they sought to dismiss the pendent state law claims for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1); and they sought to dismiss the fraud claims pursuant to Fed.R.Civ.P. 9(b) for failure to plead fraud with particularity.

In an opinion dated August 10, 1987, Judge Duffy granted the motion to dismiss Counts One through Seven and Thirteen, and he dismissed with leave to replead Counts Eight through Twelve. In dismissing the amended complaint, however, Judge Duffy did not rely primarily on the arguments raised by appellees in support of the motion to dismiss. Instead, he dismissed every count of the complaint, except the counts claiming breach of contract and fraud, on the ground that appellants had failed to state a claim upon which relief could be granted. The court dismissed Counts One and Two, which claimed violations of § 1 of the Sherman Act, on the grounds that appellants had failed to allege another party with whom appellants conspired to restrain trade, 678 F.Supp. at 1039, and that none of the conduct alleged in the amended complaint constituted unreasonable restraints of the men's professional tennis market. *Id.* at 1042–43. Judge Duffy dismissed Count Three, the monopolization claim, on the ground that MIPTC did not possess monopoly power, *id.* at 1043; he did not expressly address the merits of Count Four, the attempted monopolization claim, or Count Five, the claim based on conspiracy to monopolize. Count Six, the tortious interference claim, was dismissed on the ground that appellants had not alleged any business relations between themselves and a third party that were harmed by appellees' behavior. *Id.* at 1044. The court dismissed Count Seven, the unfair competition claim, for failure to allege that appellees had misappropriated appellants' property, *id.* at 1044–45, and Count Thirteen, the product disparagement claim, for failure to allege special damages, *id.* at 1046. The remaining counts were dismissed with leave to replead.

Appellants thereafter appealed with respect to Counts One through Seven and Thirteen, pursuant to 28 U.S.C. § 1292(a)(1) (1982). This court denied appellees' motion to dismiss the appeal with respect to Counts One through Seven and granted the

motion to dismiss the appeal with respect to Count Thirteen. *See* 839 F.2d at 77. Now, on appeal, Volvo, IMC, and ProServ claim (1) that the district court erred by dismissing their claims, without leave to amend, on grounds neither raised by appellees nor briefed by appellants below; (2) that they have adequately alleged antitrust injury as well as the necessary elements to support their claims under §§ 1 and 2 of the Sherman Act; and (3) that the court erred in dismissing the tortious interference count. IMC and ProServ also argue on appeal that the district court erred in dismissing the unfair competition claim—Volvo, however, has chosen to withdraw its unfair competition claim.

## II

### Ripeness

Appellees moved to dismiss appellants' challenge to MIPTC's four *proposed* rules on the ground that this challenge was not ripe for adjudication. The district court did not address this argument, and appellees have not raised it on appeal. Nevertheless, to the extent that "issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy,'" *Regional Rail Reorg. Act Cases,* 419 U.S. 102, 138, 95 S.Ct. 335, 356, 42 L.Ed.2d 320 (1974) (footnote omitted), we should consider such issues *sua sponte. See, e.g., Suburban Trails, Inc. v. New Jersey Transit Corp.,* 800 F.2d 361, 365 (3d Cir.1986); *American Trucking Ass'ns v. I.C.C.,* 747 F.2d 787, 790 (D.C.Cir.1984); *Johnson v. Sikes,* 730 F.2d 644, 647–48 (11th Cir.1984); 13A C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3532.1, at 135 (2d ed. 1984) ("Wright, Miller & Cooper").

As the Supreme Court has noted, the purpose of the ripeness doctrine "'is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements.'" *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580, 105 S.Ct. 3325, 3332, 87 L.Ed.2d 409 (1985) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). Ripeness therefore "'is peculiarly a question of tim-

ing,'" *id.* (quoting *Regional Rail Reorg. Act Cases,* 419 U.S. at 140, 95 S.Ct. at 357), and it cautions courts against adjudicating "'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" *id.* at 580–81, 105 S.Ct. at 3333 (quoting Wright, Miller & Cooper § 3532). Two additional factors, "'the fitness of the issues for judicial decision'" and "'the hardship to the parties of withholding court consideration,'" also inform any analysis of ripeness. *Id.* at 581, 105 S.Ct. at 3333 (quoting *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515). The fitness of an issue for judicial decision depends at least in part on the extent to which the issue is "purely legal, and will not be clarified by further factual development." *Id.; see also Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515. In considering the hardship to the parties of withholding consideration, a court must be mindful that "'[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough.'" *Regional Rail Reorg. Act Cases,* 419 U.S. at 143, 95 S.Ct. at 358 (quoting *Pennsylvania v. West Virginia,* 262 U.S. 553, 593, 43 S.Ct. 658, 663, 67 L.Ed.2d 1117 (1923), *reaff'd,* 263 U.S. 350, 44 S.Ct. 123, 67 L.Ed. 1144 (1923)).

As appellees argued before the district court, the fact that the proposed rules "may never be enacted, or alternatively, may be enacted in a form which completely alleviates plaintiffs' concerns," seems to suggest that any challenge to the proposals is premature. "The difference between an abstract question and a 'case or controversy' is one of degree, [however], and is not discernible by any precise test." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). In some instances, "the prospect or fear of future events may have a real impact on present affairs," Wright, Miller & Cooper § 3532.2, at 143, such that a preemptive challenge is ripe. *See, e.g., Bowsher v. Synar,* 478 U.S. 714, 727 n. 5, 106 S.Ct. 3181, 3189 n. 5, 92 L.Ed.2d 583 (1986); *Pacific Gas & Elec. Co. v. State*

**64**

*Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983); *Pierce v. Society of Sisters,* 268 U.S. 510, 534, 536, 45 S.Ct. 571, 574, 69 L.Ed. 1070 (1925); *Pennsylvania v. West Virginia,* 262 U.S. at 593, 43 S.Ct. at 664. In the antitrust context in particular, a rule that has yet to be enacted or enforced may be ripe for review if its mere proposal is likely to inhibit competition. *See, e.g., North Am. Soccer League v. National Football League,* 465 F.Supp. 665 (S.D.N.Y.1979) ("*NASL v. NFL*") (district court entertained an antitrust challenge to a *proposed* amendment to the constitution and bylaws of the National Football League that would have prevented NFL owners from acquiring any interest in another major team sport), *complaint dismissed,* 505 F.Supp. 659 (S.D.N.Y.1980), *aff'd in part, rev'd in part, and remanded,* 670 F.2d 1249 (2d Cir.), *cert. denied,* 459 U.S. 1074, 103 S.Ct. 499, 74 L.Ed.2d 639 (1982).

■ Applying the foregoing principles to the facts as alleged in the amended complaint, we conclude that appellants' challenge to the Special Events Rule is ripe for consideration. Appellants claim that this rule is having a present anti-competitive effect because "persons or entities involved with Special Events and ... persons involved with MIPTC-sanctioned events are inhibited and deterred from entering into contracts with ProServ and IMC that extend into the future ... because they fear that ProServ and IMC will be compelled by the new rule to break either their agreements involving Special Events or their agreements involving MIPTC-sanctioned events." Likewise, appellants allege that "owners and producers of MIPTC-sanctioned events, including Volvo, are afraid to enter into long-term agreements with ProServ or IMC for fear that the defendants will force them to choose between breaching their contract with the player-agent and losing their MIPTC sanction." In our view, these allegations plausibly suggest how the proposed rule may have "a real impact on present affairs"; and under these circumstances, to withhold consideration until the rule is actually adopted

might work considerable hardship on appellants. We note also that the proposal, as alleged, appears to be straightforward: it threatens to prohibit persons associated with sanctioned events from producing any Special Events. Thus, its effect is unlikely to be clarified substantially by whatever "further factual development" would accompany its enactment. For these reasons, we conclude that appellants' challenge to the Special Event Rule is ripe for consideration.

We believe, however, that any challenge to the three remaining proposals would be premature, even though appellants have suggested various ways in which these rules might have an impact on present affairs. The amended complaint states that the Best Interest Rule, which would give MIPTC the power to refuse to sanction any event that would not serve "the best interest of the sport," is having a present anticompetitive effect because owners and producers of sanctioned events "must exercise extreme care ... to comply with all demands of [MIPTC] because of fear that [MIPTC] will otherwise utilize the new rule to refuse to sanction or withdraw the sanction of" a given event. Likewise, appellants claim that the Conflicts of Interest Rule—which would allow MIPTC to prohibit certain players from participating in sanctioned events as wild cards—is having a present anticompetitive effect because "owners and producers of MIPTC-sanctioned events are being deterred from entering into any contractual relationships with player-agents ... for fear that ... the ongoing business relationship with the player-agent will cost that event its sanction or its cont[r]ol over its Wild Cards." Finally, appellants claim that the rule relating to pooled television broadcasting rights is having a present anticompetitive effect because "it deters television companies from entering into long-term television contracts ... because of concerns about (1) the competition with an MIPTC contract with a television company for a substantial package of television broadcast rights to MIPTC-sanctioned events, and (2) the legal effects of [the] rule." These alleged

present effects are all more attenuated, however, than the alleged present effect of the Special Events Rule. It is also much more difficult to predict how appellees will choose to employ the three remaining rules should they be enacted; thus, unlike the effect of the Special Events Rule, the effect of the other proposed rules may be clarified by the further factual development that would accompany their adoption.

We therefore hold that appellants' challenges to the proposed Best Interest Rule, the Conflicts of Interest Rule, and the rule relating to the pooling of television broadcasting rights are not ripe for review. In the event that these rules are adopted, appellants, of course, are free to reinstitute their challenges. *See* Wright, Miller & Cooper § 3532.1, at 137 (dismissal for lack of ripeness is not a decision on the merits for purposes of preclusion by judgment). We therefore vacate so much of the district court's order as dismissed with prejudice appellants' claims relating to the Best Interest Rule, the Conflicts of Interest Rule, and the rule relating to pooled broadcasting rights, and we direct the court to dismiss the claims relating to these rules *without* prejudice.

### III

#### Sua Sponte Dismissal

Appellees raised four principal arguments in support of the motion to dismiss: that the challenge to the proposed MIPTC rules, as discussed above, was not ripe for review; that appellants' antitrust claims were insufficient for failure to allege antitrust injury; that the court lacked jurisdiction over the state law claims; and that appellants had failed to plead the fraud claims with sufficient particularity. Appellants argue on appeal that the district court addressed none of these issues, and that the court dismissed the complaint on grounds neither briefed nor argued by any of the parties, thus depriving appellants of the opportunity to brief or argue the relevant issues. *See, e.g., Square D Co. v. Niagara Frontier Tariff Bureau,* 760 F.2d 1347, 1365 (2d Cir.1985) (district court has no authority to dismiss complaint for fail-

ure to state a claim upon which relief can be granted without giving plaintiff an opportunity to be heard), *aff'd,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). In response, MIPTC claims that the court *in effect* dismissed the antitrust counts of the complaint based on appellants' failure to plead antitrust injury. *See* Appellees' Br. at 12, n. 9 ("The District Court granted the motion [to dismiss] based on appellants' failure to allege harm to competition ..., which is another way of articulating the antitrust injury requirement.").

■ We agree with appellants that the court erred by dismissing the complaint on grounds that were not briefed by either party. The court dismissed appellants' claims under § 1 of the Sherman Act on the grounds that appellants failed to allege a conspiracy, and that none of the conduct alleged in the amended complaint constituted unlawful restraints on competition in the men's professional tennis market. *See* 678 F.Supp. at 1042–43. The court dismissed the monopolization claim on the ground that MIPTC lacked monopoly power, *id.* at 1044; it did not address the claims based on attempted monopolization and conspiracy to monopolize. We are not persuaded by appellees' argument that, in dismissing the complaint, the court simply engaged in "another way of articulating the antitrust injury requirement." As we read the opinion, the court decided the antitrust claims for reasons which appellants had no reason to anticipate.

In sum, we conclude that the district court erred by granting the motion to dismiss on grounds neither raised nor briefed by the parties. Conceivably, we could remand with instructions that the district court consider appellees' arguments relating to antitrust injury and extend to appellants an opportunity to brief the issues which the court did address. In their submissions to this court, however, all the parties have addressed the issue of antitrust injury, and we think the better course is to resolve this issue ourselves. In addition, since appellants have devoted substantial portions of their appellate briefs to the issues discussed in the district court's opin-

ion, and for the sake of judicial economy, we think it is appropriate for us to decide whether appellants have stated claims for relief under §§ 1 and 2 of the Sherman Act and under the common law of tortious interference with prospective business relationships and unfair competition. We therefore address these issues *seriatim*.

## IV

### *Antitrust Injury*

#### 1. General Considerations

Appellees' principal argument, both before the district court and on appeal, is that appellants lack "antitrust standing" to challenge appellees' allegedly anticompetitive conduct. In particular, appellees claim that the amended complaint fails to allege that appellants have sustained or are threatened with "antitrust injury," which is an element of antitrust standing.

Two sections of the Clayton Act, 15 U.S.C. § 12 *et seq.* (1982 & Supp. IV 1986), permit private parties to institute actions under the federal antitrust laws. In relevant part, § 4 of the Clayton Act, 15 U.S.C. § 15 (1982), states that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States ..., and shall recover threefold the damages by him sustained." Section 16 of the Clayton Act, 15 U.S.C. § 26 (1982), states that "[a]ny person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." Although these sections, if read literally, would provide a remedy to "any person" injured by an antitrust violation, courts have limited the scope of these provisions to particular classes of plaintiffs and the redress of particular forms of injury. Thus, to recover damages under § 4 or to qualify for injunctive relief under § 16, a plaintiff "must show more than simply an 'injury causally linked' to" an antitrust violation; "instead, 'plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill, Inc. v.*

*Monfort of Colorado, Inc.*, 479 U.S. 104, 107 S.Ct. 484, 489, 93 L.Ed.2d 427 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (emphasis in original)). However, even if a party adequately demonstrates that he has suffered antitrust injury, he "may not be a proper plaintiff under § 4 for other reasons." *Cargill*, 479 U.S. at 110 n. 5, 107 S.Ct. at 489 n. 5. Among the "other reasons" that may limit a plaintiff's right to recover damages under § 4 are: (1) "the directness or indirectness of the asserted injury"; (2) "the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement"; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries. *See Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 540–45, 103 S.Ct. 897, 909–12, 74 L.Ed.2d 723 (1983). Some, but not all, of these secondary factors may also limit a plaintiff's right to injunctive relief under § 16. *Cargill*, 479 U.S. at 111 n. 6, 107 S.Ct. at 490 n. 6.

Appellants claim on appeal that "MIPTC coordinates horizontal competitors banding together to eliminate competition among themselves and to use their collective power to limit the competitive opportunities of outsiders." In other words, appellants view MIPTC as a vehicle through which certain entities, primarily other tournament owners and producers, have established a cartel in the market for men's professional tennis; allegedly, this cartel has not only limited output and raised prices in the market for men's professional tennis events, but has also used its market power to inhibit competition from the owners and producers of Special Events. ProServ and IMC claim that the cartel has injured them, in their capacities as owners and producers of Special Events, (1) by restricting their ability to obtain a sufficient supply of players' services for Special Events; (2) by causing them to own and produce fewer

Special Events than they otherwise would have owned and produced; and (3) by causing the Special Events that they have owned and produced to be less profitable than these events otherwise would have been. Volvo claims similar injuries as a potential owner and producer of Special Events. In addition, all three appellants claim that they have been injured in their capacities as owners and producers of sanctioned events because compliance with MIPTC's rules has prevented them from competing "freely and vigorously with the events owned and produced by the defendants and their co-conspirators."

In response, MIPTC argues that none of the practices challenged by appellants—MIPTC's administration of the Grand Prix circuit, the MIPTC–WCT Agreement, the Commitment Agreements, the bonus pool system, and so on—have caused appellants to suffer "injury of the type the antitrust laws were intended to prevent." In connection with each of these challenged practices, MIPTC raises the following argument in one form or another: if appellants' theory is correct, and MIPTC is the vehicle through which tournament owners and producers have organized a cartel in the market for men's professional tennis, then appellants lack standing to challenge the cartel because, as owners and producers of sanctioned tournaments, appellants themselves are members of the cartel who stand to benefit from the cartel's unlawful activity. *Cf. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 583–88, 106 S.Ct. 1348, 1354–57, 89 L.Ed.2d 538 (1986) (plaintiffs, manufacturers of electronic merchandise, could not recover damages for alleged conspiracy by their competitors to charge higher than competitive prices in violation of the Sherman Act, because plaintiffs stood to benefit from such a conspiracy); Note, Cargill, Inc. v. Monfort of Colorado, Inc.: *The Supreme Court Restricts Private Antitrust Challenges to Horizontal Mergers*, 1987 Wis.L.Rev. 503, 521–22 (arguing that, to the extent a horizontal merger facilitates oligopoly pricing, a competitor of the merging entities stands to benefit from the resulting price increase). Taken to its logical conclusion, appellees' argument suggests that we adopt a *per se* rule prohibiting putative cartel members from asserting antitrust claims against other members of the cartel.

■ We decline to adopt a rule precluding cartel members from raising antitrust challenges against the cartel. As one commentator has noted, "even absent legal restraint the cartel is inherently more fragile than the single-firm monopolist. The interests of the cartel as a whole often diverge substantially from the interests of individual members." H. Hovenkamp, *Economics and Federal Antitrust Law* § 4.1, at 83 (1985) ("Hovenkamp"). *See also* L. Sullivan, *Handbook of the Law of Antitrust* § 61, at 162–63 (1977) (discussing instability of cartels); R. Posner, *Economic Analysis of Law* § 10.1, at 266 (3d ed. 1986) (same). Individual members of the cartel may face different costs; some may be more efficient than others, and "some may produce slightly different products, which cost either a little less or a little more than the product sold by other cartel members." Hovenkamp § 4.1, at 84. Thus, even though a particular trade restraint adopted by a cartel presumably operates to the cartel's *aggregate* benefit, the restraint may operate to the detriment of an *individual* member. Of course, the mere fact that a particular restraint may cause a cartel member to suffer injury is not a sufficient condition to establish antitrust standing; as noted above, the harm must be "injury of the type the antitrust laws were intended to prevent." Thus, a restraint that merely prevents a cartel member from acquiring a greater share of the fruits of the cartel would not cause the member to suffer antitrust injury, because "[t]he antitrust laws ... were enacted for 'the protection of *competition*, not *competitors*.'" *Brunswick*, 429 U.S. at 488, 97 S.Ct. at 697 (citing *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962) (emphasis in original)). But to the extent a cartel member credibly asserts that it would be better off if it were free to compete—such that the member's interest coincides with the public interest in vigorous competition

—we believe that the individual cartel member satisfies the antitrust injury requirement. *See, e.g., Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 139–40, 88 S.Ct. 1981, 1984–85, 20 L.Ed.2d 982 (1968); *Los Angeles Mem. Coliseum Comm'n v. National Football League,* 791 F.2d 1356, 1364–65 (9th Cir. 1986), *cert. denied,* —— U.S. ——, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987); *Board of Regents v. NCAA,* 707 F.2d 1147, 1151–52 (10th Cir.1983), *aff'd,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984). We therefore hold that a cartel member has antitrust standing to challenge the cartel to which it belongs, to the extent that the member can demonstrate antitrust injury and subject to the "other reasons" set forth in *Associated General Contractors.* With these considerations in mind, we proceed now to address appellees' arguments that appellants lack antitrust standing to challenge the particular restraints alleged in this case.

### 2. Applying Antitrust Injury Analysis

### a. MIPTC's Administration of the Grand Prix Circuit

■ As noted above, appellants claim that, in administering the Grand Prix, MIPTC has denied appellants "the opportunity to produce tennis events in the manner they seek with respect to matters such as site location, player compensation and scheduling." In response, appellees argue that, to the extent appellants themselves are owners and producers of events sanctioned by MIPTC, they "are only helped by rules minimizing scheduling conflicts," and that "the MIPTC rule limiting the amount of prize money which can be awarded by an event ... cannot possibly hurt appellants in their association with MIPTC sanctioned events" because appellants stand to "benefit from a ceiling on one of the key costs of running an event."

For the following reasons, we conclude that appellants have standing to challenge the administration of the Grand Prix circuit. Because the individual cartel member's interests may diverge from the interests of the cartel as a whole, MIPTC's decisions relating to site location and sched-uling might not work to appellants' advantage, even though appellants are owners and producers of sanctioned events. Appellants claim that MIPTC uses its power "to shield tournaments favored by MIPTC from the rigors of competition," and, in our view, this allegation satisfies the antitrust injury requirement. Moreover, as Volvo argues on appeal, the rule limiting the amount of prize money that may be awarded by sanctioned events may injure appellants, as owners and producers of such events, by preventing them from "compet[ing] against other Grand Prix events for the services of highly ranked players by offering more prize money." Once again, although a particular rule may work to the aggregate benefit of the owners and producers of sanctioned events, it may not benefit an individual owner or producer such as Volvo, ProServ, or IMC. Thus, because appellants' individual interests may coincide with the public interest in promoting competition, we believe that appellants have satisfied the first element of the standing analysis. Finally, we see no reason why, on the facts of this case, the "other reasons" set forth in *Associated General Contractors* —relating to the directness or speculativeness of the injury, the difficulty of apportioning damages, and so on—should foreclose appellants from proceeding with their challenge to the MIPTC's administration of the Grand Prix.

### b. The MIPTC–WCT Agreement

■ In response to appellants' argument that appellees, by means of the MIPTC–WCT Agreement, have divided markets, fixed prices, limited output, and otherwise cooperated to exclude competition, MIPTC charges that "appellants fail to explain how they have sustained antitrust injury as a result of the WCT–MIPTC agreement," and that "appellants are really complaining about the fact that MIPTC offered WCT beneficial terms to persuade it to apply for sanctioning, but have not made the same offer to appellants' Special Events." Moreover, in their brief, appellees cite this court's decision in *Eastway Construction Corp. v. City of New York,* 762 F.2d 243

(2d Cir.1985), *cert. denied*, —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), for the proposition that "MIPTC's alleged 'favoring' of WCT events does not constitute anticompetitive conduct."

We believe, however, that appellants have standing to challenge the MIPTC–WCT Agreement for essentially the same reasons that appellants have standing to challenge MIPTC's decisions relating to scheduling and location. A conspiracy on the part of MIPTC and WCT to restrain trade would not necessarily work to the equal benefit of every member of the alleged tennis cartel; therefore, to the extent that MIPTC and WCT may have agreed unlawfully to divide the market and to fix prices in such a way as to favor WCT events over events owned and produced by appellants, appellants have standing to challenge the agreement. By contrast, in *Eastway* the conduct alleged in the complaint—New York City's refusal to deal with firms that had defaulted on municipal loans—clearly was not violative of the antitrust laws, and the appellants in that case therefore did not suffer antitrust injury. *Eastway*, 762 F.2d at 250–51.

### c. Commitment Agreements

■ The amended complaint alleges that the Commitment Agreements inhibit men's professional tennis players from competing in Special Events. Appellees counter the attack on the Commitment Agreements by arguing, first, that "appellants stand only to gain from each of the alleged restrictions on the market for men's tennis playing services," because "any incentives for players to sell their services to the Grand Prix … can only benefit appellants" in their capacity as owners and producers of MIPTC-sanctioned events. Appellees also urge that "appellants' allegations respecting the Commitment Agreement[s] … at most state a claim that is purely derivative of an antitrust claim which *players* might have," and that this court "has steadfastly refused to recognize antitrust standing for parties harmed only derivatively." Appellees' Br. at 30 n. 19 (emphasis in original). Finally, appellees contend that IMC and ProServ, in their capacities as owners and producers of Special Events, lack standing to challenge the Commitment Agreements because (1) "they do not plead any events which have failed or even suffered because of the Commitment Agreements," and (2) the amended complaint does not allege that the Commitment Agreements *prohibit* players from participating in Special Events, but only that appellants will have to pay more to induce players who participate in Grand Prix events to participate in non-sanctioned events.

Notwithstanding the foregoing arguments, we conclude that appellants have standing to challenge the Commitment Agreements. As alleged, the Commitment Agreements discourage players from participating in non-sanctioned events and, therefore, increase the cost of producing these events. Accordingly, IMC and ProServ, in their capacities as owners and producers of non-sanctioned Special Events, may have suffered "injury of the type the antitrust laws were intended to prevent." Moreover, by restricting the supply of players available for non-sanctioned events, the Commitment Agreements also discourage owners and producers from disassociating themselves from MIPTC. To the extent that owners and producers of sanctioned events, such as Volvo, would otherwise find it in their economic interests to compete against the alleged tennis cartel, these owners and producers also have suffered the type of injuries the antitrust laws were intended to forestall. Thus, in our view, all three appellants have satisfied the element of antitrust injury.

In addition, in assessing the "other reasons" of *Associated General Contractors*, we see no reasons why appellants should be precluded from proceeding with this litigation. Appellees' argument that appellants' claim is "purely derivative" of whatever claim the players may have is unpersuasive in light of our analysis above; appellants' alleged injury is not so "indirect" as to deny them the right to challenge the Commitment Agreements. And, despite the fact, as noted by appellees, that IMC and ProServ have not alleged any particular tournaments that "failed or suffered"

as a result of the Commitment Agreements, we do not believe that the alleged injury is so inherently speculative as to merit dismissal at this stage of the litigation.

#### d. Bonus Pool

■ Appellees argue that Volvo, ProServ, and IMC lack standing to challenge the bonus pool system, which, as we have noted, requires owners and producers of sanctioned events to contribute to a pool providing additional compensation to players who perform well at sanctioned events throughout the year. Appellees claim that appellants, "as owners and producers of MIPTC-sanctioned events, ... benefit from the existence of the bonus pool," because the pool "allegedly provides a 'significant economic incentive' to players to participate in as many Grand Prix events as possible." Thus, they contend, "[t]he mere fact that they may have been required to contribute to something which operates to their advantage cannot be said to constitute an injury, let alone an injury of the type which Congress enacted the antitrust laws to prevent." Appellees also dispute appellants' argument that the bonus pool illegally restricts players from participating in Special Events, "because players who choose to participate in the Grand Prix actually do so out of economic self-interest, as any rational market participant would."

In our view, however, IMC and ProServ, as owners and producers of Special Events, have standing to attack the bonus pool system to the extent that this system, like the Commitment Agreements, may discourage players from competing in Special Events. Moreover, as owners and producers of sanctioned events, IMC, ProServ, and Volvo have standing for two reasons. First, like the Commitment Agreements, the bonus pool system may discourage appellants from attempting to compete against MIPTC. Second, because the interest of an individual cartel member may diverge from the aggregate interest of the cartel, Volvo, ProServ, and IMC may be better off choosing for themselves how much to invest to encourage players to participate in sanctioned tournaments rather than being compelled to invest however much the alleged cartel dictates. We thus conclude that appellants also have standing to contest the bonus pool system.

#### e. Special Events Rule

■ Finally, we believe that appellants have standing to attack the proposed Special Events Rule because the rule, if adopted, might discourage appellants, as owners and producers of sanctioned events, from becoming involved with non-sanctioned tournaments that could compete with MIPTC events. Moreover, ProServ and IMC have standing to challenge the rule, in their capacity as owners and producers of non-sanctioned events, to the extent that the rule might coerce them into abandoning their involvement with Special Events.

To summarize, we hold that appellants have standing under the antitrust laws to challenge the five practices identified in the foregoing paragraphs. We now proceed to review the district court's rulings on the substantive aspects of appellants' antitrust, tortious interference, and unfair competition claims.

### V

#### A. *Section 1 Claim*
##### 1. "Contract, Combination ... or Conspiracy"

Section 1 of the Sherman Act, 15 U.S.C. § 1 (1982), forbids "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce among the several States." As we have noted previously, § 1 is directed only at joint action, and "does not prohibit independent business actions and decisions." *Modern Home Inst. v. Hartford Accident & Indem. Co.*, 513 F.2d 102, 108 (2d Cir.1975). An agreement between two or more persons is fundamental to any § 1 claim. *Id.* at 108–09.

■ Relying on these principles the district court held that appellants failed to state a claim for relief under § 1, because they failed to allege an agreement between

two or more persons. According to the district court:

> The only co-conspirator named in the complaint is the ITF. The ITF formed MIPTC originally, participates in MIPTC's operation, and ITF members make up one-third of MIPTC. Because ITF makes up part of MIPTC, and because it is legally impossible to conspire with oneself, *United States v. Gisehaltz,* 278 F.Supp. 434, 437 (S.D.N.Y.1967), plaintiffs can make out no claim of conspiracy to restrain trade or to monopolize against ITF and MIPTC. Plaintiffs also allege that other co-conspirators exist, "some of whom may not be known to the plaintiffs at this time."
>
> First Amended Complaint, at ¶ 8. However, no conspiracy claim can stand against unidentified and unknown third parties.

678 F.Supp. at 1039. Although we agree with the principle that it is impossible to conspire with oneself, we do not believe that the district court was correct to apply this principle in the present case. As we have noted, MIPTC is an association consisting of representatives of national tennis associations, tournament owners and directors, and professional tennis players. Courts have consistently held that, since joint ventures—including sports leagues and other such associations—consist of multiple entities, they can violate § 1 of the Sherman Act. *See, e.g., NCAA v. Board of Regents,* 468 U.S. 85, 99 & n. 18, 104 S.Ct. 2948, 2959 & n. 18 82 L.Ed.2d 70 (1984), and sources cited therein; *Associated Press v. United States,* 326 U.S. 1, 12–13, 65 S.Ct. 1416, 1420–21, 89 L.Ed.2d 2013 (1945); *NASL v. NFL,* 670 F.2d at 1256–58. We therefore hold that appellants have adequately alleged the element of contract, combination, or conspiracy.

### 2. "In Restraint of Trade"

On appeal Volvo, IMC, and ProServ contend that their complaint alleges three "classic forms of *per se* illegal conduct": price fixing, horizontal market division, and group boycott. We address each of these theories in turn.

### a. Price Fixing

The amended complaint clearly alleges that MIPTC has engaged in price fixing. Paragraph 24 of the amended complaint states that MIPTC has "fixed the compensation that can be paid to players at other men's professional tennis events." Paragraph 57 of the amended complaint states that "[a]ll owners and producers seeking sanction for their events must agree ... to ceilings on player compensation." Finally, in relevant part, paragraph 118(g) of the amended complaint states that appellants, "as owners and producers of men's professional tennis events sanctioned by MIPTC, have been harmed in that, among other things, ... they have been denied the opportunity to produce tennis events in the manner they seek, with respect to such matters as ... player compensation." Accordingly, we reverse so much of the district court's order as dismissed appellants' claim for relief from the alleged price-fixing conspiracy.

Assuming that appellants succeed in proving the foregoing allegations, however, we express no opinion at this time as to whether appellees' conduct should be condemned as *per se* unlawful or, instead, should be analyzed under the Rule of Reason. Normally, "agreements among competitors to fix prices on their individual goods and services are among those concerted activities" that are considered *per se* illegal under § 1 of the Sherman Act. *Broadcast Music, Inc. v. Columbia Broadcasting System,* 441 U.S. 1, 8, 99 S.Ct. 1551, 1556, 60 L.Ed.2d 1 (1979). *See also Arizona v. Maricopa County Medical Soc'y,* 457 U.S. 332, 347, 102 S.Ct. 2466, 2474, 73 L.Ed.2d 48 (1982) ("We have not wavered in our enforcement of the *per se* rule against price fixing."). The relevant inquiry, however, involves more than "a question simply of determining whether two or more potential competitors have literally 'fixed' a 'price.'" *Broadcast Music,* 441 U.S. at 9, 99 S.Ct. at 1557. Instead, "'price fixing' is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable." *Id. See also* Hovenkamp

§ 4.4, at 128 ("Once a court has properly characterized a practice as price fixing, it is *per se* illegal. However, determining *when* a practice should be so characterized can be very difficult, and may involve a fair amount of sophisticated economic inquiry."). Moreover, we recognize that professional sporting events cannot exist unless the producers of such events agree to cooperate with one another to a certain extent, and that the antitrust laws do not condemn such agreements when coordination is essential if the activity is to be carried out at all. *See, e.g., NCAA v. Board of Regents,* 468 U.S. at 101, 104 S.Ct. at 2960; Roberts, *Sports Leagues and the Sherman Act: The Use and Abuse of Section 1 to Regulate Restraints on Intraleague Rivalry,* 32 UCLA L.Rev. 219, 227–28 (1984); R. Bork, *The Antitrust Paradox* 278–79 (1978). Thus, on remand, the district court should carefully consider whatever arguments appellees may offer in support of their practices relating to player compensation before deciding whether the *per se* rule or the Rule of Reason should apply.

### b. Horizontal Market Division

■ Appellants also claim that appellees have unlawfully agreed to a horizontal market division of the type condemned in *United States v. Topco Assocs.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972), and *United States v. Sealy, Inc.,* 388 U.S. 350, 87 S.Ct. 1847, 18 L.Ed.2d 1238 (1967). According to appellants, "[o]ne of the prime continuing objectives of defendants' cartel is minimizing any direct competition among Grand Prix tournaments or with the ITF's events by agreeing to schedule their events during different weeks and in different cities." The district court did not expressly consider appellants' horizontal market division theory.

In our view, the complaint adequately alleges an unlawful horizontal market division. The aforementioned paragraph 118(g) states, *inter alia,* that MIPTC has denied appellants "the opportunity to produce tennis events in the manner they seek, with respect to such matters as site location … and scheduling." In addition, as we noted above, appellants have alleged that the 1983 MIPTC–WCT Agreement resulted in the division of the market between the two competing tennis circuits. Literally construed, the amended complaint clearly states that appellees have agreed to restrain competition among the owners and producers of sanctioned events. Accordingly, we reverse so much of the lower court's order as dismissed appellants' claims relating to horizontal market division. We express no opinion as to whether the horizontal restraints alleged in the amended complaint should be subject to a *per se* rule or to the Rule of Reason. *See NCAA v. Board of Regents,* 468 U.S. at 98–103, 104 S.Ct. at 2958–61.

### c. Group Boycott or Concerted Refusal to Deal

■ Finally, appellants claim that appellees have unlawfully agreed to engage in a group boycott or concerted refusal to deal. According to appellant ProServ, "the Grand Prix tournaments have collectively agreed not to permit the participation by any player who fails to accept the conditions the group imposes upon the player's activities for an entire year." Thus, men's professional tennis players "confront through the Commitment Agreements a horizontal agreement among competing producers of tennis tournaments setting forth the terms under which they will collectively decline to deal with the players."

Judge Duffy considered the Commitment Agreements to be "essentially employment contracts that require employee players to play only for MIPTC for thirty-six weeks a year." 678 F.Supp. at 1042. The court then stated that "[e]mployers may impose reasonable employment conditions for a reasonable period of time," and that "[e]ven accepting plaintiffs' assertion that creating an independent tennis event series is not feasible during the remaining weeks of the year, I cannot find that an exclusive employment contract for thirty-six weeks a year is imposed for an unreasonable length of time." *Id.* at 1042–43.

In our view, the amended complaint adequately alleges that appellees have threatened to engage in a group boycott or concerted refusal to deal. Generally, a group boycott is "an agreement by two or more persons not to do business with other individuals, *or to do business with them only on specified terms.*" *Mackey v. National Football League,* 543 F.2d 606, 618 (8th Cir.1976) (emphasis added) (quoting Note, *Concerted Refusals to Deal Under the Antitrust Laws,* 71 Harv.L.Rev. 1531 (1958)), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). *See also Union Circulation Co. v. FTC,* 241 F.2d 652 (2d Cir.1957). To prevail on a group boycott or refusal to deal claim, a plaintiff must demonstrate that the defendant intends to restrain competition, or to enhance or expand his monopoly, and has acted coercively. *Official Airline Guides, Inc. v. FTC,* 630 F.2d 920, 927–28 (2d Cir.1980), *cert. denied,* 450 U.S. 917, 101 S.Ct. 1362, 67 L.Ed.2d 343 (1981).

As with the allegations relating to price fixing and horizontal market division, we see no need at this stage of the litigation to express an opinion whether, on remand, the district court should apply a *per se* rule or the Rule of Reason to the restrictions that allegedly constitute a concerted refusal to deal. We note only that *"certain* concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1," *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.,* 472 U.S. 284, 290, 105 S.Ct. 2613, 2617, 86 L.Ed. 2d 202 (1985) (emphasis added), while others do not "share with the *per se* forbidden boycotts the likelihood of predominantly anticompetitive consequences," *id.* at 295, 105 S.Ct. at 2620. Whether the threatened boycott alleged in the amended complaint falls into the former or the latter category is a matter for the district court to consider in due course.

## B. *Section 2 Claim*

Appellants also claim that the district court erred by dismissing their claims for relief under § 2 of the Sherman Act, 15 U.S.C. § 2 (1982). Appellants argue that MIPTC has violated § 2 by engaging in monopolization, attempted monopolization, and conspiracy to monopolize. We address each of these theories *seriatim.*

### 1. Monopolization

The offense of monopolization under § 2 of the Sherman Act consists of two elements: (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596 n. 19, 105 S.Ct. 2847, 2854, 86 L.Ed.2d 467 (1985) (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966)); *National Ass'n of Pharmaceutical Mfrs. v. Ayerst Laboratories,* 850 F.2d 904, 915 (2d Cir. 1988). Appellants clearly have alleged that MIPTC possesses monopoly power over the production of first-rate men's professional tennis events. Paragraph 50 of the amended complaint, for example, alleges that in 1985 the top one hundred men's professional tennis players all signed Commitment Agreements. Moreover, the amended complaint alleges that appellees have willfully maintained their monopoly power (1) by merging with WCT in 1983; (2) by requiring players to sign Commitment Agreements; and (3) by requiring owners of sanctioned events to contribute to the bonus pool. Although the facts may eventually bear out the district court's conclusion that MIPTC has not willfully maintained its monopoly power, and that MIPTC instead has benefited from "the recent historical development of men's professional tennis," we do not believe that the district court was correct to draw this conclusion on a motion to dismiss.

### 2. Attempted Monopolization

The offense of attempted monopolization under § 2 of the Sherman Act requires proof of three elements: (1) anticompetitive or exclusionary conduct; (2)

specific intent to monopolize; and (3) a dangerous probability that the attempt will succeed. *Ayerst*, 850 F.2d at 915 (citing *International Distrib. Centers v. Walsh Trucking Co.*, 812 F.2d 786, 790 (2d Cir.), *cert. denied,* ___ U.S. ___, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987)). Proof of the first element of an attempted monopolization claim, anticompetitive or exclusionary conduct, may be used to infer the second element, specific intent to monopolize; and when coupled with proof of monopoly power, evidence of anticompetitive conduct may demonstrate a dangerous probability of success. *Id.* (citing *Northeastern Tel. Co. v. American Tel. & Tel. Co.*, 651 F.2d 76, 85 (2d Cir.1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982)).

In the present case, the district court did not address appellants' attempted monopolization claim. For the reasons stated above, however, we believe that the complaint clearly alleges the first two elements of an attempted monopolization claim, exclusionary conduct and specific intent to monopolize. In addition, since the complaint alleges both exclusionary conduct *and* the existence of monopoly power, the third element, a dangerous probability of success, may be inferred.

### 3. Conspiracy to Monopolize

■ Under § 2 of the Sherman Act, the offense of conspiracy to monopolize requires proof of (1) concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. *United States v. Consolidated Laundries Corp.*, 291 F.2d 563, 573 (2d Cir.1961). For reasons already stated, we believe that the complaint alleges concerted action and specific intent to monopolize. Moreover, the various practices to which appellants object could qualify as overt acts. Accordingly, appellants have stated a claim of conspiracy to monopolize.

### C. *Interference with Prospective Business Relations*

■ Under New York law, to prevail on a claim of tortious interference with prospective business relations, a plaintiff must demonstrate that the defendant interfered with business relations existing between a plaintiff and a third party, either with the purpose of harming the plaintiff or by means that are dishonest, unfair, or improper. *PPX Enters. v. Audiofidelity Enters.*, 818 F.2d 266, 269 (2d Cir.1987). Although there is some case law suggesting that the plaintiff must identify a particular contract or contractual negotiations that are the basis of the action, *see El Greco Leather Prods. Co. v. Shoe World, Inc.*, 623 F.Supp. 1038, 1044 (E.D.N.Y.1985), *rev'd in part on other grounds*, 806 F.2d 392 (2d Cir.1986), *cert. denied,* ___ U.S. ___, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987), more accurately, the tort usually involves interference with a business relationship not amounting to a contract. *See PPX*, 818 F.2d at 270, and sources cited therein.

In light of this standard, we believe that the district court erred in dismissing Volvo's claim for tortious interference. Volvo has alleged that MIPTC interfered with Volvo's relations with various parties. Paragraph 89 of the amended complaint, for example, alleges that "the defendants have embarked on a program to persuade or intimidate television networks and tournament owners, producers and directors to interfere with Volvo's reasonable promotional activities in connection with its ownership, production, and sponsorship of various tennis events." Paragraph 90 claims that appellee Happer sent letters on behalf of MIPTC to NBC Sports, the Public Broadcasting Service, ESPN, and USA Network stating that Volvo was attempting to mislead the public into believing that Volvo still retained the overall sponsorship of the Grand Prix. Paragraph 92 alleges that Happer sent additional letters to certain tournament owners and producers "seeking to dissuade and intimidate them from associating with Volvo or permitting Volvo to participate in the ownership, production, and sponsorship of Grand Prix events." Finally, paragraph 94 asserts that representatives of MIPTC have used their monopoly power over men's professional tennis by threatening punitive action against certain tournament owners and producers if they were to permit Volvo to display

banners bearing the logo "Volvo Tennis." In our view, these allegations state a claim for relief on the ground of interference with prospective business relations. Although Volvo does not allege any particular contract that was lost as a result of appellees' activities, Volvo does allege the requisite interference for the purpose of harming Volvo. Accordingly, we reverse so much of the district court's order as dismissed Volvo's tortious interference claim.

On the other hand, ProServ and IMC have not alleged any particular business relations with which appellees interfered. As far as we know, however, ProServ and IMC have not exhausted their opportunities to amend the pleadings. Moreover, even after a party has amended its pleadings once, further leave to amend "shall be freely given when justice so requires," Fed.R. Civ.P. 15(a), and a district court's "outright refusal to grant the leave without any justifying reason appearing for the denial is [an] abuse of ... discretion." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Accordingly, we vacate that portion of the district court's order dismissing with prejudice ProServ and IMC's interference claim, and we remand with instructions that this claim be dismissed without prejudice to ProServ and IMC's filing an amended complaint consistent with the legal standards discussed above.

### D. *Unfair Competition Claim*

█ Finally, as we noted, only ProServ and IMC have chosen to pursue the unfair competition claim on appeal. The tort of unfair competition "usually concerns the taking and use of the plaintiff's property to compete against the plaintiff's own use of the same property." *Roy Export Co. Establishment v. Columbia Broadcasting System*, 672 F.2d 1095, 1105 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed. 2d 63 (1982). As the district court stated, to plead a claim of unfair competition a plaintiff must allege: (1) acts or omissions by defendants that proximately caused a misappropriation; and (2) the property or benefit misappropriated. 678 F.Supp. at

1045 (citing *Bunch v. Artec Int'l Corp.*, 559 F.Supp. 961, 972 (S.D.N.Y.1983)). In the present case, ProServ and IMC have alleged various "acts or omissions by defendants," including "oral communications and correspondence with the media and tournament directors, adoption of rules restricting competition, and other actions [that] constituted acts of unfair competition." The section of the amended complaint discussing the property that allegedly was misappropriated, however, lacks specificity; ProServ and IMC claim only that appellees "have sought to acquire, and have improperly reaped, the benefits of plaintiffs' skill, expenditures, and labor by misappropriating plaintiffs' property rights to defendants' own commercial advantage." In our view, this latter allegation is insufficient to support a claim of unfair competition. Nevertheless, we believe that ProServ and IMC should be given the opportunity to amend their pleadings to conform with the appropriate legal standard. Accordingly, we vacate the dismissal of ProServ and IMC's unfair competition claim and we remand with instructions that this claim be dismissed without prejudice to ProServ and IMC's filing a second amended complaint specifying what property has been misappropriated. *See Bunch*, 559 F.Supp. at 972.

### CONCLUSION

For the reasons stated above, we vacate so much of the district court's order as dismissed with prejudice appellants' antitrust challenges to the Best Interest Rule, the Conflicts of Interest Rule, and the rule relating to pooled television broadcasting rights, and we remand with instructions that the district court dismiss the challenges to these rules with leave to replead in the event that the rules are actually adopted. We also vacate the dismissal of ProServ and IMC's claims for tortious interference with prospective business relations and unfair competition, and we remand with instructions to dismiss these claims with leave to replead.

**76**

With respect to the remaining issues on appeal, we reverse. In our view, appellants have standing to attack MIPTC's administration of the Grand Prix circuit, the MIPTC–WCT Agreement, the Commitment Agreements, the bonus pool system, and the Special Event Rule. The complaint adequately alleges that appellees have engaged in price fixing, horizontal market division, and that they have threatened a concerted refusal to deal. The complaint further alleges, properly, that appellees have engaged in monopolization, attempted monopolization, and conspiracy to monopolize. Finally, we believe that Volvo has adequately stated a claim for relief for interference with prospective business relations. Accordingly, we remand for further proceedings consistent with this opinion.